A. DITTMAR v. J. V. DIGNOWITTY ET AL.

No. 5788.

1. **Ancient Grant—San Antonio.**—See testimony held insufficient to show the character or extent of the grant from the crown of Spain in 1733 or 1734 to the city of San Antonio.

2. **Same.**—The court can not judicially know the character of such grant, but may look to laws in force when it is claimed the grant was made, and to the proceedings through which parties claim, etc., for the purpose of ascertaining the title sued upon, even if some kind of grant was made to the inhabitants of the city as early as 1733.

3. **San Antonio, When Founded.**—That the city was established by the government of Spain prior to the year 1733 is a fact historically well established, and that, as was usual and required by the laws then in force, a territory was set apart for the use of the inhabitants can not be doubted.

4. **Grants to Cities in the Spanish Provinces.**—We know of no law which vested in a city or town title in fee to the lands within its limits or deprived the Spanish government of power to sell or dispose of lands therein not given or sold to individuals or dedicated to some use essentially public. Hall's Mex. Laws, secs. 114–149.

5. **Mode of Granting Land Within Towns and Cities.**—The usual manner of granting lands to inhabitants within the limits of the city when once established was through the action of the municipal authorities, which, however, seems to have been at all times subject to control of viceroys, presidents of audiencias, and governors of provinces, who had power to revoke all such grants unless they had been approved by the king of Spain.

6. **Grant of Lot of Land Within City in 1818.**—See proceedings held to evidence a valid grant to Villa Senor in 1818 of the land in controversy, and under which

the appellee claims, the land lying within the recognized limits of the city at the time.

7. **Legislation of Republic and State of Texas.**—Legislation since this country passed from the Spanish dominion evidences an intention that the city of San Antonio should hold in fee all lands within its ancient limits which before that period had not become the property of individuals, but such legislation was not intended to destroy private ownership existing under laws in force prior to that time.

8. **Presumption from Age.**—The long continued recognition of the grant coupled with forty years continuous possession is strongly persuasive that an existing grant had been made by the legal authorities.

9. **Purchaser with Notice.**—Against such older title a purchaser in 1843 from the city took no title. An older claim appearing upon the city maps affected a purchaser with notice.

APPEAL from Bexar. Tried below before Hon. G. H. Noonan.

An outline statement of the nature and result of the suit is given from the brief of appellees.

This is a suit in trespass to try title and for damages, brought by Dittmar against Dignowitty and wife for the recovery of a tract of land situated in San Antonio, Bexar County, Texas, and being described in plaintiff's petition as part of block No. 47 in the city of San Antonio, and having "an irregular and almost triangular shape, measuring on said Plum or Chestnut Street, counting from the southwest corner of said block 47, about 32 varas more or less, and measuring along said North First Street, now Starr Street, about 115 varas more or less, width on the eastern being about 15 or 20 varas more or less, the northern boundary line being curved."

The defendants pleaded not guilty.

The case was tried before the court on December 9, 1885, and judgment was rendered finding that the plaintiff had sued defendants for a tract of land described as above, the description in the judgment being copied from plaintiff's petition, and further finding that the plaintiff failed to sustain his suit, and it was therefore adjudged that the plaintiff take nothing by his suit and that defendants go hence with their costs. From which judgment plaintiff has prosecuted this appeal.

The appellant claims title under a deed from the city of San Antonio to Bryan Callaghan, dated in 1842. This is a special warranty deed against any one claiming by, through, or under the city. Appellant further proved warranty deeds of conveyance from the heirs of Callaghan to himself, dated in August, 1870, conveying the property in question.

Appellees claim title under a grant from the Spanish government, extended 1818 by Antonio Martinez, as the political and military Governor of the Province of Texas, to Don Ignacio Villa Senor, and mesne conveyances from the original grantee down to the appellees.

Dittmar appeals.

*Shook & Dittmar*, for appellant, filed an elaborate brief. Its length and form prevent an attempt at collating the many points made and discussed.

*Ogden, Ogden & Johnson*, for appellees. — 1.　The appellant failed to prove title from the sovereignty of the soil, and could not therefore recover.　Lewis v. San Antonio, 7 Texas, 288; Kinney v. Vinson, 32 Texas, 127; Hooper v. Hall, 35 Texas, 83.

2.　The premises in question were appropriated in 1818 by a grant from the Spanish government to Don Ignacio Villa Senor, under which appellees claim, which grant constituted a valid, subsisting, and outstanding title, which must bar a recovery by appellant.

3.　The grant to Villa Senor is in due form and issued by the Governor of Texas, who, under the Spanish government, had the power to grant lands.　[See opinion.]　Jones v. Muesbach, 26 Texas, 237; San Antonio v. Lewis, 15 Texas, 388.

4.　If there ever was in fact a prior grant to the municipality of San Antonio embracing the land in question it was simply establishing an *ejido* or a municipal grant to be subdivided among the citizens, and the grant to Villa Senor, like the adjoining *suertes* to Eloa and Le Baum and others shown on the city maps, was but a subdivision of the *ejido* made by the proper granting officer, and will as such be presumed to be valid.　San Antonio v. Lewis, 15 Texas, 388; Brownville v. Basse, 36 Texas, 451; Hanrick v. Jackson, 55 Texas, 27; Hancock v. McKinney, 7 Texas, 384; Ruiz v. Chambers, 15 Texas, 590; Hatch v. Dunn, 11 Texas, 717; Holliman v. Peebles, 1 Texas, 709.

STAYTON, CHIEF JUSTICE.—This action was brought by appellant to recover a triangular piece of land situated between North Street and an ancient road in the city of San Antonio formerly known as *Camino de las Carretas*.

It is a part of a block conveyed by the city in 1842 to those through whom appellant shows title.

The following statement occurs in the statement of facts:　"It was proved as a historical fact that the crown of Spain, about the year A. D. 1733 or 1734, granted to the municipality that afterwards became the city of San Antonio certain lands, and that the lot or lots of land in controversy were inside the limits of said grant."

This is based on the evidence of appellant, who stated:　"I have always heard that there was a grant from the king of Spain to the city of San Antonio, dated about 1733 or 1734.　I understand the grant has been lost; at all events it can not be found."　And upon the evidence of another witness, who testified:　"I have heard there was a grant from the Spanish crown to the city of San Antonio in 1733 or 1734 that would include this property, but I have never seen the grant; my information is that it is lost."

There is nothing more in the record tending to show the character or extent of the grant made to the city of San Antonio; and although in several other cases there has been much evidence in regard to the grant, we

can not judicially know its character, but may look to the laws in force when it is claimed the grant was made, and to the proceedings through which appellee claims, together with other evidence offered, for the purpose of ascertaining whether appellee has title, even if some character of grant was made to the inhabitants of the city as early as 1733.

In the month of February, 1818, Ignacio Villa Senor, a citizen of the town then known as San Fernando de Bexar, made application to the political and military Governor of the province of Texas for a grant of land for agricultural purposes, which was described as fronting on the north side of the Alameda 100 varas, and with a depth of 240 varas, bounded on the west by land of Felipe Elna, on the east by vacant land, and on the other end by the road leading to the country.

This petition was referred to the syndic procurador by the Governor for a report whether the land was vacant. On February 9, 1818, that officer reported to the Governor that the land was vacant, and that there was no reason why it should not be granted to the applicant, but at the same time he stated that there was no surplus water that could be granted with the land, as the applicant had asked.

On February 20 following the Governor ceded the land to the applicant by a most formal decree, which declared that he " will enjoy and possess the same as legitimate owner and possessor, with all the uses, customs, and appurtenances to the same belonging, now and forevermore, as well as his children, heirs, and successors, quietly, peaceably, without any contradiction, or without any person to claim a better right for the reason that said land was not improved; he to improve the same within the six months required by law, and as provided in article 1, title 11, of the new garrison regulations, and to keep the same in his possession without transferring it until the end of four years possession."

On February 22 following juridical possession was given. All these several steps in the title are evidenced by the testimonio, the genuineness of which is not questioned, and in a note to that the following statement is made and signed by the Governor:

" Besides the 240 varas of depth stated in the act of this possession it has some more up to the road which is the boundary to which this donation extends; and in order that he be not molested in the enjoyment of said land as well as the lot, I sign this with my hand April 25, 1818.

"ANTONIO MARTINEZ."

The application and other proceedings also embraced a building lot in the town.

There is no controversy as to the true locality of the Alameda, the old road, and the tract of land called for as the western boundary.

Ignacio Villa Senor conveyed the land to Ignacio Casas, and appellee claims through conveyance from his heirs. Casas having died some time prior to 1841, his widow, in accordance with Mexican custom, but not in

accordance with the laws then in force, in that year partitioned his estate between herself and their children, embracing in the partition the land in controversy; and it is shown that they and those claiming under them have been in possession for more than forty years before this action was brought, during all of which time the city is not shown to have asserted title to the land, although it laid off into blocks and lots contiguous lands which it did sell.

The block which appellant now claims was so mapped and sold by the city as early as 1842, and the conflict between that and the grant under which appellee claims is the only thing that bears any semblance of claim by the city to any part of the land, except that it has run streets across the tract.

On the maps of the city in use and made by its engineer from 1848 the grant to Villa Senor has been recognized.

Under evidence of this character the court rendered a judgment for the defendant.

There can be no doubt as to the true locality of the land granted to Villa Senor, but it is claimed that the grant was void because the land was embraced within the grant to the city of San Fernando de Bexar. That the city was established by the government of Spain prior to the year 1733 is a fact historically well established; and that, as was usual and required by the laws then in force, a territory was set apart for the use of the inhabitants can not be doubted.

It does not follow from this, however, that title to the lands embraced within the city limits so vested in the city as a corporation as to deprive the Spanish government of power to confer title to parts of it on individuals.

We know that house lots and lands for cultivation were granted in cities so established to inhabitants, and that these became their private property. Other lands within such cities were appropriated for *ejidos,* and for pasture and other purposes, and these were for the use and benefit of the inhabitants generally; but it is not believed that the absolute ownership of lands in such cities or towns ever vested in them as corporations so long as Spanish dominion continued over the country.

Lands in cities and towns granted to individuals became their private property; and places essentially public, such as plazas, may have been inalienable, and thus the title to them in a sense vested in the city or its inhabitants. We, however, know of no law which vested in a city or town title in fee to the lands within its limits, or deprived the Spanish government of power to sell or dispose of lands therein not given or sold to individuals or dedicated to some use essentially public. Hall's Mexican Law, 114–149, in which reference is made to the Laws of the Indies, applicable to the matter.

In the absence of evidence other than such as is found in the record be-

fore us, we are not prepared to hold that the government of Spain had not power in 1818 to make the grant under which appellees claim, even though the land therein embraced was within the limits of the city of San Antonio.

There is no doubt that the usual manner of granting lands to inhabitants within the limits of the city when once established was through the action of the municipal authorities, which, however, seems to have been at all times subject to control of viceroys, presidents of audiencias, and governors of provinces, who had power to revoke all such grants unless they had been approved by the king of Spain.  This, however, was consistent with title in fee in the Spanish government.

In the case before us the grant through which appellees claim was made by the provincial governor, who, so far as the record shows, acted without the assistance of the ayuntamiento or city council upon information given to him by the procurador.

We are not advised whether there was a city council at that time; but if it appeared that there was, with the scanty means at our command for acquiring correct information as to the powers of Spanish officials at that time, we would not feel authorized to hold that a grant such as that in question made by a provincial governor was made without authority, even if it were shown that all lands within the city limits vested in it in fee. If it were necessary the facts shown by the record before us ought to be held sufficient to create the presumption that the officer had full power to make the grant in question.

Legislation since this country passed from the Spanish dominion evidences clearly an intention that the city of San Antonio should hold in fee all lands within its ancient limits which had not before that period become the property of individuals, but such legislation was not intended to destroy private ownership existing under laws in force prior to that time.

It would be useless to comment on the facts existing since 1818 tending to show that the authorities at all times have recognized the validity of the grant under which appellees claim, but we may say that such long continued recognition of its validity is almost if not conclusive of the question.

Many assignments of error are presented, but they present questions which are all subordinate to the one already considered and could not control the ultimate disposition of the case.

We are of the opinion that the court below rendered such a judgment as was required by the facts, and it will be affirmed,

*Affirmed.*

Delivered June 17, 1890.