**SAN ANTONIO RIVER AUTHORITY,**
Petitioner,

v.

**G. Garrett LEWIS et al., Respondents.**

No. A–8304.

Supreme Court of Texas.

Nov. 28, 1962.

Rehearing Denied Jan. 23, 1963.

Sawtelle, Hardy, Davis & Goode, San Antonio, for petitioner.

Foster, Lewis, Langley & Onion, San Antonio, for Lewis et al.

Oliver & Oliver, San Antonio, for Daniel & Townsend.

CALVERT, Chief Justice.

The judgment rendered herein on February 14, 1962, is set aside and the judgment of the Court of Civil Appeals is affirmed. The opinions heretofore filed herein are withdrawn and the following is now filed as the opinion of the court.

This is a declaratory judgment suit.

Petitioner is a governmental agency created by the Legislature pursuant to authority contained in Section 59 of Article 16 of the Constitution of Texas, Vernon's Ann.St. See Art. 8280–119, Vernon's Annotated Texas Civil Statutes. In discharge of its duty of flood control and for the protection of the lives, health and property of those living or owning property in the area, it is engaged in a project of straightening, widening and deepening the channel of the San Antonio River. By this suit it seeks a judgment declaring that it is not responsible in damages to the respondents-landowners by reason of diverting the waters of the river from their accustomed channel to a new channel some two hundred feet to the west. The trial court, by summary judgment, did so declare. The Court of Civil Appeals at San Antonio, the Chief Justice dissenting, reversed the judgment of the trial court and remanded the case for trial of respondents' claims for damages which are asserted by cross-action. 343 S.W.2d 475.

■ Respondents claim certain rights to water for irrigation under grants made by the Mexican government in 1824. Their position is that these rights are vested property rights which have been taken, damaged or destroyed by the changing of the river channel and for which they are entitled to compensation under Section 17 of Article I of the Constitution of Texas.[1] Petitioner's claim to non-liability rests upon an assertion that respondents have no vested property rights which are taken, damaged or destroyed by the changing of the river channel, and that, in any event, the changing of the river channel is an exercise of the police power of the State for the consequences of which there can be no liability in damages.

The trial court was of the opinion that respondents' "irrigation rights" are "vested property rights," but that such rights were granted, and are held, subject to "the inherent power of the State, reasonably exercised, to protect the public health, safety and welfare without making compensation" for the taking or damaging thereof. Based upon that opinion, or conclusion, the court adjudged the taking of respondents' rights to be *damnum absque injuria*. The Court of Civil Appeals also held that respondents have certain vested property rights which are being taken, damaged or destroyed by the changing of the channel of the river, but, contrary to the declaration of the trial court, held that the fact that the river channel was being changed by petitioner in the exercise of the State's police power did not insulate it against liability.

In order to determine the rights of the parties it is necessary to summarize the material facts which appear to be without dispute.

In 1730 the Spanish government established the Mission of San Juan Capistrano on the east side of the San Antonio River, a few miles south of the original site of the present City of San Antonio. Mission personnel, no doubt with the aid of Indian labor, built an acequia or irrigation ditch on the east side of the river in 1731. Water was diverted from the river by a dam, built in the bed of the river, which raised the water level and permitted water to enter

1. "Sec. 17. No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person * * *."

the ditch by gravity flow through a headgate. Water from the river was thus made available to the mission and for irrigation of lands adjacent to the ditch. The irrigation system is similar to others built by early Spanish settlers in and near San Antonio and El Paso.[2]

In 1824 Mexico, then an independent nation of which Texas was a part, made grants of land and of water to settlers along the San Juan ditch. One of these grants, fairly illustrative of all, is copied as a footnote to the opinion of the Court of Civil Appeals. See 343 S.W.2d 478–479. The instrument was executed by Jose Antonio Saucedo, Gefe Politico of the Province, on February 5, 1824, and recites:

"* * * I have decided to grant him [Francisco Maynes] and I do hereby grant him in the name of the Mexican Nation, two dulas[3] of irrigation water with the accompanying land for cultivation; the water to be taken from the irrigation conduit of the Mission of San Juan Capistrano, so that as his own property he may cultivate and enjoy the land within the term prescribed by law; he may possess it for his own use or the use of his successors at the rental of 10 pesos annually which he must pay for the said dulas granted him for the period of four years, in accordance with the provisions of the Very Excellent Provincial Deputation. After the four years have elapsed he may enjoy the two dulas of irrigation water, clear of all encumbrance and as such he may sell or mortgage them at his pleasure.

"To this end Francisco Maynes will be placed in formal possession of the two dulas of water, and will be provided with any certified copy or copies he may request in protection of his title."

On February 7, 1824, Saucedo executed another instrument which recites:

"I * * * went to the land which by the preceding decree I had granted to the petitioner, Bachelor Francisco Maynes, and there I measured two suertes of land with 200 varas on each frontage. * * *

"I placed the petitioner, Bachelor Francisco Maynes, in real and corporal possession of the land with its accompanying irrigation water, * * *."

On June 25, 1825, Saucedo signed a writing in which he recited: "Francisco Maynes paid 40 pesos to this government, the amount of the five pesos annual tax imposed on him for four years on each of the two dulas of irrigation water with the accompanying land which were granted to him in the labor of San Juan Mission."

The dam, headgate and ditch, although renewed and repaired from time to time, were still in existence, and in use as facilities for irrigating respondents' lands until the river channel was changed by petitioner. Except for destruction of the dam, none of the physical structures of the irrigation system have actually been taken, damaged or destroyed by petitioner. Petitioner has installed a pump in the new channel of the river which is being used temporarily to pump water into the irrigation ditch, without prejudice to the legal rights of the parties.

To clarify the question before us it may be well to note some questions which are not here for decision. Petitioner does not deny

2. Informative discussions of these early irrigation systems and their operation and management may be found in The Spanish Element in Texas Water Law by Dobkins; The Community Acequia: Its Origin and Development, 31 S.W. History Quarterly, by Hutchins, and in a Memorandum on The Spanish and Mexican Irrigation System prepared by the Water Division of the office of the Attorney General of Texas.

3. A "dula" of water was a "day" of water —one day's flow of the water in the acequia. On this acequia, irrigation rights were based on a twenty-five day cycle.

that respondents have vested property rights to take water from the San Antonio River for irrigation; it assumes they do, and so will we. Petitioner does not claim that diversion of the waters to a new channel is in aid of navigation. Petitioner does not question respondents' rights of access over its land to the new channel of the river for the purpose of obtaining the water to which they are entitled, and the trial court's judgment confirmed, in effect, easements in respondents across lands of petitioner for the transportation of the water to the mouth of the San Juan ditch by any means which do not seriously interfere with flood control or the flood control project. As we analyze respondents' pleadings, they do not seek to recover damages based on the value of their lands as depreciated by loss of, or damage to, any of the physical structures composing the irrigation conduit—the ditch, the headgate and the dam; rather, they seek to recover damages based on the value of their lands as depreciated by loss of their rights to obtain the granted waters from their accustomed channel through the irrigation conduit. We will approach the problem on that basis.

■ Viewed in the proper factual context, the irrigation water, although to be taken from the San Juan ditch, was granted from the San Antonio River. True, as stated in the opinion of the Court of Civil Appeals, the river is not mentioned in the grants, but the river was the real source of the waters granted. The question to be decided, then, as the issue has been narrowed, is whether under the Mexican grants respondents acquired, as against the sovereign, vested property rights to have the waters of the San Antonio River continue to flow in their accustomed channel. The question must be answered under Mexican law applicable when the grants were made. Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; Luttes v. State, 159 Tex. 500, 324 S.W.2d 167.

■ Associate Justice Pope of the Fourth Court of Civil Appeals at San Antonio has recently written a scholarly and comprehensive analysis of the sources from which the law applicable to Spanish and Mexican grants in this state must be derived. See The State of Texas v. Valmont Plantations, Tex.Civ.App., 346 S.W.2d 853. There is no need to undertake here a second analysis, no doubt of less luster, of the same matter. History records that the constitutional and statutory law of the Mexican nation and of its component States, like the government itself, was in an unsettled state from the date of the independence of the nation in 1821 until the promulgation of the Federal Constitution of the United Mexican States on October 4, 1824. It was during this period that the water grants to respondents' predecessors in title were made. Research does not disclose any Mexican constitutional, code or other law which, in itself, either expressly or impliedly governs the question as it has been stated above. In the absence of any such law it is an accepted fact that the civil law of Spain was the law of Mexico and fixed the rights of the grantees under the grants. Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 85 A.L.R. 451. Hence, we must turn to the Spanish law for an answer to the question. Inasmuch as we have been cited to no Spanish law which expressly governs the question and none has been found by research, our conclusion of necessity must rest upon a process of reasoning from law which tends to shed light on it.

■ We begin our process of reasoning in the matter with acceptance of the fact that the decisions of this court, made only after careful analysis of Spanish law, have long since affirmed that under that law the sovereign was the owner of the beds of all perennial streams in this State, whether navigable or not, State v. Grubstake Inv. Assn., 117 Tex. 53, 297 S.W. 202; Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, and that while the sovereign could, indeed, grant the beds to individuals, City of Galveston v. Menard, 23 Tex. 349, it will not be presumed to have

done so, and will not be held to have done so in the absence of direct and certain evidence that such was its intention. City of Galveston v. Menard, 23 Tex. 349; State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728. Acceptance of that fact may well mean that respondents did not acquire property rights in the bed of the San Antonio river. The grants do not expressly create easements or impose servitudes for continued maintenance of the dam in the river bed and it may be strongly reasoned from Spanish law that none are to be implied. Law 5, Title 17, Book IV, *Recopilacion de las leyes de Indias*, 2 White 56; Laws 6 and 8, Title 28, Part 3, *Las Siete Partidas*; Hall's Laws of Mexico, §§ 1388, 1401, 1406; An Act Concerning Irrigation Property, 3 Gammel's Laws of Texas 958. Continued existence of the dam in the bed of the river appears not to have been reasonably necessary to enjoyment of the water granted from the acequia; there were other methods of capturing and delivering the water into the ditch. But whether the grants do or do not create easements or impose servitudes in the river bed is not determinative of the true question in the case, viz.: Did respondents acquire, as against the sovereign, vested property rights to have the waters of the river continue to flow in their accustomed channel?

In Rhodes v. Whitehead, 27 Tex. 304, 310, this court declared that "*Aqua currit et debet currere ut currere solebat*, is a maxim no less of the civil than the common law." Black's Law Dictionary translates and defines the Latin phrase *Aqua currit et debet currere, ut currere solebat* as follows: "Water runs and ought to run, as it has used to run. 3 Bulst. 339; 3 Kent, Comm. 439; A running stream should be left to flow in its natural channel, without alteration or diversion. A fundamental maxim in the law of watercourses." See also Haas v. Choussard, 17 Tex. 588. The Code law

of Spain as expressed in *Las Siete Partidas* gives validity to our former declaration.

There are express provisions in *Las Siete Partidas* protecting the rights of those entitled to the use of waters of streams against diversion by others of such waters from their accustomed channel. Thus it is provided in Law 13, Title 32, Part 3, that one who "obstructs the current, or *diverts the stream*[4] so that others who are accustomed to make use of it, cannot irrigate their lands by it, as they were formerly accustomed to do" shall demolish the offending structures at his own cost and expense and shall pay all damages and losses suffered by his neighbors by reason thereof. In Law 15, Title 32, Part 3, it is provided that if a stream running through the lands of several persons becomes obstructed from natural causes "so that the channel is cut off, *and the water removed from the place where it formerly flowed*" the person on whose land the obstruction occurs can be compelled to "open the channel through which the water formerly ran and cause it to resume its accustomed course" or to permit the complaining party to open it. By Law 16, Title 32, Part 3, protection is afforded a purchaser from an injured party against one who has built a structure ("anything") on his premises "by means of which water is cut off *or obstructed where it was formerly accustomed to flow*," and rights against the offender are preserved even though he has sold his land. By Law 17, Title 32, Part 3, similar protection and separate rights to damages against multiple offenders are preserved even though he has sold his land. By Law 18, Title 32, Part 3, it is provided that one may build a mill or a machine propelled by water power for beating cloths on his own land, "or on ground belonging to the king" with his consent, near another such mill or machine, but that the "work should, however, be performed in such a way that the course of the water will not interfere with the other mill, but that the party may freely have it *as it was*

4. Emphasis ours throughout unless otherwise indicated.

*formerly accustomed to run."* See Scott's Translation, Pages 871–873. These detailed provisions of the *Partidas* manifest a clear purpose in the Spanish law to protect one's right to the use of waters of a stream against diversion by others of the waters from their accustomed channel. It hardly seems reasonable to say that the sovereign reserved the right to do the very thing which the law so carefully prohibited others from doing.

Considering that respondents' predecessors in title paid for their rights to water, which they were at liberty to sell or to mortgage at their pleasure, at a time and under circumstances when both they and the sovereign must have contemplated that the waters of the San Antonio River would continue to flow indefinitely in their accustomed channel, we are disposed to resolve any doubt of a proper answer to the question in favor of respondents. The water rights of the grantees were neither riparian nor appropriative; but our holding will harmonize the rights of respondents with the rights of riparians in this area of the law, McGhee Irrigating Ditch Co. v. Hudson, 85 Tex. 587, 22 S.W. 398, 967, 22 S.W. 967, and they ought not to enjoy less. If the rights granted were to have value it was essential that the waters of the river continue to flow in their accustomed channel. The grantees knew that when they purchased their rights to water from the river and the Mexican government knew it when it sold them. To hold that the right to change the river channel was reserved to the sovereign would be to permit the sovereign to take or to destroy, without compensation, rights which it had sold for compensation. But for consent by petitioner to the granting of an easement across its lands by judicial decree, respondents' rights to water would have been lost entirely. What effect the granting of the easement will have on the legal measure or the recoverable amount of respondents' damages is not in issue on this appeal.

Once we conclude, as we do, that respondents' predecessors in title acquired vested rights to have the waters of the San Antonio River continue to flow in their accustomed channel, we must reject the idea that petitioner can take the rights without payment of compensation. By changing the channel of the river and diverting its waters petitioner is taking respondents' property. McGhee Irrigating Ditch Co. v. Hudson, 85 Tex. 587, 22 S.W. 967, 968; Mud Creek Irr. Agr. & Mfg. Co. v. Vivian, 74 Tex. 170, 11 S.W. 1078, 1079. The provisions of Section 17, Article I of the Constitution of Texas applies as well to the State and its agencies as to private corporations. Similar limitations on the right of the sovereign to take private property are found in Spanish and Mexican law.

In Part II, Title 1, Law 2, of *Las Siete Partidas*, dealing with the power possessed by the emperor and how he should make use of the empire, it is said that the emperor has "no authority to deprive anyone of his property without his consent, unless he does something on account of which he should lose it by reason of law. And where it happens that the emperor was compelled to take it, for the reason that he had need to make disposition of it for the common benefit of the country, he is required by law to give beforehand something in fair exchange for said property which is worth as much, or more, so that the owner is remunerated in the sight of all good men."

One of the restrictions imposed on the power of the king in Article 172 of the Constitution of 1812 for Spain and her dominions reads:

"The King can not appropriate the property of any private individual or corporation, nor disturb them in their possession, use and benefits of it; and if in some specific case it should be deemed necessary to seize the property of a private individual for a purpose of recognized public utility, it could not be effected without, at the same time, indemnifying him, by giving him a fair compensation in the good judgment of honest men (of the commun-

ity) *in good standing.*" (See Diccionario de la Administración Española, by M. Martínez Alcubilla, 6th ed. Vol. IV, p. 267. Madrid, 1915, as translated by Dr. Ramon Martinez of the University of Texas faculty).

Paragraph 3 of Article 112 of the 4th Section of the 1824 Constitution of Mexico provides (1 Gammel's Laws of Texas 86):

"The president cannot occupy the property of any individual or corporation, nor disturb them in their possession or use of the same; and if in any case it should be necessary for some object of acknowledged utility to take the property of an individual or a corporation, it cannot be done without previous approbation of the senate, and in the recess, the council of government, always *indemnifying* the party the value fixed by appraisers chosen by himself and the government."

In like manner the Constitution of Coahuila and Texas of 1827 imposed a restriction on the power of the governor in this language (1 Gammel's Laws of Texas 330):

"Fourth,—Take possession of the property of any private individual or corporation, or disturb him in the possession, use, or benefit thereof, unless it should be necessary for a purpose of manifest public utility in the judgment of the executive council, in which case he may do so with the concurrence of the council, and approval of congress, and during the recess, of the permanent deputation, always indemnifying the party interested agreeably to the opinion of appraisers chosen by the executive and the said party."

A similar provision was included in the Constitution of the Republic of Texas in which it was provided (1 Gammel's Laws of Texas 1083):

"No person's particular services shall be demanded nor property taken or applied to public use, unless by the consent of himself or his representative, without just compensation being made therefor according to law."

Similar provisions have been included in every Constitution of the State.

It was contended in Brazos River Authority v. City of Graham, Tex.Sup., 354 S.W.2d 99, as it is here, that the property involved was being taken or destroyed in the exercise of the police power and that the taking was therefore *damnum absque injuria.* This court rejected the contention without attempting "a distinction between the power of eminent domain and an exercise of the police power" because it would "involve us in a sophistic Miltonian Serbonian Bog." 354 S.W.2d 99, 105. We need not enlarge on what we said in that opinion. We consider it as foreclosing the argument that respondents' property may be taken as an incident of the exercise of the police power, without the payment of compensation.

Petitioner is granted fifteen days from this date in which to file a motion for rehearing.

SMITH, CULVER, NORVELL and STEAKLEY, JJ., dissenting.

NORVELL, Justice (dissenting).

In the concluding sentence of the opinion of the Court of Civil Appeals it is said that "appellants (respondents Lewis et al.) have vested property rights in the *San Juan Dam, headgate* and ditch." 343 S.W.2d 481. This stated conclusion is the basis upon which the final holding of the Court of Civil Appeals is based. This Court has now affirmed the judgment of the Court of Civil Appeals upon the primary holding that some vested property right was violated because the petitioner has moved the channel of the San Antonio River. While I recognize that this case must turn upon the definition or delineation of the rights which respondents possess with reference to the San Juan Acequia and the water therein, I am unable to agree with the

basic holdings of either court as above stated. I find myself ·in· general agreement with the trial judge and the dissenting justice of the Court of Civil Appeals, ·although there are differences as to detail.

My thesis is that respondents have no vested right in and to the bed or banks of the San Antonio River, nor to the dam and headgate located therein, and that they have no vested right to demand that the river remain in its present channel. Such rights as respondents possess seem adequately protected by the judgment of the trial court, —at least they are not prejudiced thereby. Any difference in legal theory between the trial court and this Court could be set at rest in·this declaratory judgment proceeding by an opinion setting forth the proper basis upon which the decretory provisions of the trial court's judgment should be affirmed.

At the risk of further augmenting the quantity of the writings in this case, of which there has been an abundance, I will here set forth a brief statement which I hope will aid in making my position clear and enable me to affirmatively state my views.

This is a suit for a declaratory judgment which terminated in a summary judgment based upon motions and affidavits filed by the respective parties. The case turns upon the nature and extent of the rights of the respondents in and to the waters of an ancient acequia or irrigation conduit (the San Juan Ditch) which originally was used to supply water to the lands of the San Juan Capistrano Mission. The trial court concluded that the bed of the San Antonio River and San Juan Dam located therein were the property of the sovereign; that the relocation of the channel of the river by the River Authority which destroyed the usefulness of the dam came within the police power and hence the loss of the gravity flow of water to the San Juan Irrigation Ditch was *damnum absque injuria.* It is conceded that petitioner in the relocating of the river was acting as an agency of the sovereign. Article 16, § 59 of the Texas Constitution. Article 8280–119, Vernon's Ann.Tex.Civ.Stats.

The trial court further declared that it would be feasible to pump water from the San Antonio River into the San Juan Ditch and it appears that water may be transported over the lands of the petitioner so that the ditch may be supplied with water from the new channel by pumping.

The lifting of water in small quantities at a time by means of primitive pumps, such as water wheels and buckets, is as old as irrigation itself and on large river courses, such as the Nile, these devices were even more common than the construction of dams which impeded the river's flow while raising the level of the water therein.[1] In· Texas, water wheels were ·sometimes used in connection with the Bexar acequias, Betty Earle Dobkins, "Spanish Elements in Texas Water Law", p. 113, and the larger portion of the irrigated section of the Lower Rio Grande Valley is today supplied with water by the use of pumps. It should also be mentioned that the corporate and governmental power of the San Antonio River Authority are extremely broad. The Authority is "declared to be a governmental agency, a municipality, body politic and corporate, vested with all the authority and full sovereignty of the State, in behalf of the State, in so far as intended by this Act, and with the authority to exercise the rights, privileges and functions hereinafter specified." Article 8280–119, § 2. Except as limited by the Act itself, the Authority is authorized to exercise, "all powers, rights, privileges, and functions necessary and convenient for accomplishing the purposes of this Act conferred by General Law upon any District or Districts created pursuant to Section 59 of Article 16 of the Constitution of Texas * * *." Article 8280–119(3). Numerous specific powers are also listed. There can be no doubt but that the Authority, should

---

I. Emil Ludwig, "The Nile" p. 247.

it elect to do so, is empowered to supply water to those having appropriative rights in and to the river's water by any means it might select.

I am in agreement with the holding of the trial court insofar as it declares that the District is not liable in damages for the loss of the gravity flow of water from the San Antonio River into the San Juan Ditch. I do not, however, reach this conclusion upon the theory that the destruction of this gravity flow by moving the river away from the dam was an exercise of the "police power", as that term is commonly understood.[2] In my opinion, the right of gravity flow by the use of a dam to raise the water level of the river was never included within the grants under which the respondents claim.

There is much discussion in the briefs relating to Spanish and Mexican legal authorities. Such discussion however leads to the conclusion that these sources throw very little light upon the problem other than what may be gleaned from general historical circumstances. Undoubtedly the San Juan acequia was a part of the ancient Spanish settlement of Bexar consisting of a villa, a presidio and a number of missions. Upon its original establishment and for sometime thereafter, no title emanated from the sovereign and such rights or privileges as were exercised by private persons were permissive and tentative only. Spanish Towns, 37 Notre Dame Lawyer 630. All inferences are against a Spanish grant to the bed of a stream or a portion thereof for a damsite. In Lewis v. San Antonio, 7

Tex. 288, this Court remarked upon the attitude of the sovereign toward alienation of property dedicated to a public use as were the banks and beds of rivers and streams. (State v. Grubstake Inv. Ass'n, 117 Tex. 53, 297 S.W. 202). It was said in the Lewis case, quoting in part from New Orleans v. United States, 10 Pet. 662, that:

> " 'So careful was the King of Spain to guard against the alienation of property which had been dedicated to public use, that in a law all such conveyances are declared to be null and void.' (10 Pet.R. 730) The law cited in the above is in Novissima Recipilacion, 1.1, b. 7, tit. 16, and is as follows, i. e.,: 'Our pleasure and will is to preserve their rights, rents, and property to our cities and places, and not to make any gift of anything of them; wherefore we command that the gift or gifts we may make of them, or any part of them, to any person whatsoever, are not valid.' " .

With the secularization of the missions, grants of the mission lands and water were made to private individuals, but the Spanish background of these grants suggests a strictness rather than a liberality of construction insofar as the rights of the grantee from the sovereign are concerned.

The title of the sovereign over the riverbed, except as may have been heretofore legally alienated (see, Anderson v. Polk, 117 Tex. 73, 297 S.W. 219) is now vested in San Antonio River Authority by legislative enactment[3] and there is no element or factor disclosed by the record other than

---

2. By the "police power" as I generally understand the term as used in the context of this case and as I believe it was used by the trial court, is meant the sovereign governmental power to destroy or damage property under certain circumstances without compensating the owner therefor, such as the destruction of a house to prevent the spread of a fire. Every governmental act designed to promote the public health, safety and welfare while within the legitimate orbit of governmental activity is not within the

police power in the sense that no compensation need be paid to the owners of property taken as an incident to the governmental program. Compare, City of San Antonio v. Pigeonhole Parking of Texas, 158 Tex. 318, 311 S.W.2d 218, 73 A.L.R.2d 640; Brazos River Authority v. City of Graham, Tex.Sup., 354 S.W. 2d 99.

3. Article 8280–119, § 3(r) provides that: "[T]his District hereby is vested with such title and right of control as the State has, or may have, in, to, and con-

actual user which would suggest an enlargement upon the express terms of the grants under which respondents claim. It is primarily the wording of these grants that determine the rights of the parties hereto.

The grants were made during an unsettled period of Mexican history from a constitutional standpoint. The particular plan for granting titles to private individuals in and to the mission lands and water dulas may have originated during the short regime of the Emperor Iturbide. Undoubtedly it was a carry-over from the period of Spanish rule. The grants purport to have been made by the Jefe Politico of the City of San Fernando de Bexar, the mother city of Texas (Lewis v. San Antonio, 7 Tex. 288; Dittmar v. Dignowity, 78 Tex. 22, 14 S.W. 268), upon the recommendation of the Ayuntamiento of the municipality, acting "In the name of the Mexican nation and by virtue of the authority vested in (him) by their Exalted Highness, the Supreme Executive Power for distribution of the lands of these Missions."

While constitutional or fundamental sovereign authority for the execution of these grants may be obscure, there is no reason to doubt the validity of such grants but on the other hand, there is no reason to enlarge their scope beyond their wording except for the considerations hereinafter mentioned.

The grant taken as an example by the Court of Civil Appeals in so many words calls for "two dulas of irrigation water with the accompanying land for cultivation; the

water to be taken from the irrigation conduit of the Mission of San Juan Capistrano." No reference is made to the San Antonio River nor to any structure therein. In view of the position of the sovereign under the Spanish system of laws, I am unable to agree with the majority of the Court of Civil Appeals that "the grant was not merely two dulas of water in the ditch, but included the right to the dam and headgate as well as the irrigation ditch." The grant says water to be taken from the San Juan conduit. To me that means "water in the ditch." I do not construe the conduit or ditch as including a device for raising water, such as a dam. The grant expressly refers only to an instrumentality for conveying water such as a ditch, canal or aqueduct. Of more importance than dictionary meaning of words, however, is the Spanish legal concept of the public interest in riverbeds and banks which was carried over into the Mexican law and renders it extremely improbable that the sovereign would have granted more than a permissive user of sort in the bed and banks of a river.

The taking of water from streams and rivers and putting the same to use upon noncontiguous lands is a practice that antedates recorded history. Clough v. Wing, 2 Ariz. 371, 17 P. 453. The irrigating process and the appropriation of waters from streams is an inheritance from the Spaniards who, in their turn, received it from the Romans and Moors. Dobkins, "The Spanish Element in Texas Water Law," p. 63.[4]

cerning the natural bed and banks of the San Antonio River in its entire length, and such tributaries thereof as may be affected by the creation of said Canal, and whether to remain as an integral part of said waterway or to be abandoned in the construction of said Canal; which investment, however, shall be in trust, and to authorize said District to make such uses, and/or disposition of such lands and rights (and the proceeds, income, revenues, or trading values thereof) as in actual experience may prove to be reasonably required for, or in aid of, the ac-

complishment of the purposes of this Act."

4. "An opposing doctrine (to the riparian system) based upon exclusive rights in the use of water for lands regardless of the matter of contiguity to streams was followed in portions of the new world by the Spanish and Mexican settlers. That doctine which we now call appropriation is also said to have had its roots in the civil law of Rome. It materially influenced the development of water law in several States of the American South-

The rights of the Mexican appropriator were not identical with those developed in the Western States under either the Colorado system (Arid Region Doctrine of prior Appropriation) or the California system (Western Doctrine of Riparian Rights). Dr. Walter Prescott Webb in "The Great Plains"[5], p. 440 states that:

"It is known that the common law adopted many principles of the civil law. But in England law developed along lines to meet the particular needs of England. The law of riparian rights came from the civil law, but England added the feature which required the stream to run as it was wont to run in its accustomed channel. As it developed in the West the arid-region doctrine of appropriation bears a closer resemblance to the civil law than to the common law of England.

"The Mexicans introduced into the Southwest a modified form of the civil

law. Since irrigation had been practiced in Spain and in Mexico, we find that its institutions were fairly well developed. The principles of the Mexican laws as applied in the Southwest were as follows:

"1. The Mexican government owned the rivers and streams, and held that the corpus of water belonged to no one; but the government could confer the exclusive use of a portion of the water on an individual or a corporation.

"2. The Mexican government could confer this right on owners of lands either riparian or nonriparian.

"3. The Mexican government had the right to grant the exclusive right to water of nonnavigable streams under stipulated conditions as to use. If the user complied with the conditions, he had a vested right in the water as long as he continued to use it. But there was no provision in the Mexican

west in which the Spaniards and Mexicans had made settlements." Wells A. Hutchins, Proceedings, Water Law Conferences, University of Texas—1954, p. 107.

Mr. Hutchins also refers to Wiel's thesis that the modern riparian doctrine was brought to the Atlantic seaboard by Kent and Story who received it from the French. "If this presentation is correct, the common law of water courses is not the ancient result of the common law, but is a French doctrine (modern at that) received into the English law only through the influence of two eminent jurists." (Said Wiel in "Waters: American Law and French Authority", 33 Harvard Law Review 133, 1. c. 147). Hutchins then points out that "The doctrine was first laid down in the English law in Mason v. Hill (5 Barn. & Adol. 1, 110 Eng.Reprint 691) in 1833, but the law waivered from then until 1849 when Wood v. Wand (Exch. 748, 154 Eng. Reprint 1047) was decided. That set the matter at rest. Having thus been received into the English common law, the riparian doctrine became the law in several of the Western States that adopted the common law of England as the rule of decision in their courts."

It seems that the English riparian system; unsuited as it was to a large section of the state and hence subsequently

modified, was imported into Texas law by the decision of Haas v. Choussard (1856), 17 Tex. 588, wherein Kent (Vol. 3, p. 439) and Mason v. Hill were cited. This gave rise to the somewhat exaggerated statement that thus Texas chose to follow the English, who knew nothing of irrigation, rather than the Spanish, who were the best irrigators on earth. As to Spanish irrigators, see, 1 Kinney 272, Dobkins, p. 63.

5. In the main Webb follows Wiel and Kinney in his discussion of Water Rights in the Western States. It is referred to here because the statements contained in "The Great Plains" are brief and succinct and at the same time sufficiently detailed for present purposes. The present day surface water system in Texas is perhaps more similar to the California (Western Doctrine of Riparian Rights) than to the Colorado (Arid Region Doctrine of Appropriation) insofar as actual operation is concerned. The Texas and California systems have radically different theoretical bases, however, because of the circumstance that the federal government never held title to Texas lands. For a brief discussion of the development of the Western Water Laws, see Webb, p. 431.

law for the acquisition of exclusive rights by prior appropriation. This fetaure was to be added by the Western states, and distinguishes the arid-region doctrine clearly from the Mexican system."

In all probability, "the people who were responsible for the origin of the (prior appropriation) doctrine were not versed in these by-ways of legal learning" relating to Spanish water customs and practices.[6] It is most likely that the miners of the California territory simply made use of a system suitable for their needs and conditions wholly unaware of the fact that centuries ago the Moors in the arid portion of the Iberian Peninsula had adopted analogous measures to meet similar situations. The Spanish civil law background has, however, been used to support the legality of an appropriation system. Clough v. Wing, 2 Ariz. 371, 17 P. 453, and analogies between the Mexican system of appropriations and that of the Western American States are entirely valid. We may, with confidence, look to similar appropriative systems in determining the rights under the Mexican plan. For example like the Spanish-Mexican appropriator, the taker of water under the prior appropriation system of the Western States acquires no property in the channel nor to the water itself, but acquires only the right of an usufructuary use. See, Wiel, 3rd Ed. §§ 277, 278 and 279.

There is one situation in the water history of the Western States which presents a close analogy to our problem here. The record before us contains much information as to prospective pump sites upon the new river channel. To change from the old river channel and its dam to the new river channel and a pump site is, in substance, nothing more than a change in the point of diversion which is a common thing in the Western States. Changes in points of diversion have been discussed in numerous decisions. In Wiel, we find the following:

"It is said, 'The appropriator took the water with the right to have the stream flow as it was wont to flow' (citing in a footnote Morris v. Bean, 146 F. [423] 435 but see Schodde v. Twin Falls, [9 Cir.] 161 F. 43) which is as strict a statement as the 'aqua currit et debet currcre ut currere solebat' of riparian rights. And he can insist on the flow, though he has also rights on another stream which would supply him—he cannot be made to exhaust his rights on one before using the other.

"This exclusive right of the prior appropriator does not, however, enable him to insist upon receiving it in the natural channel; the upper appropriator may instead give it to him by returning it to him into his ditch above his place for use—not necessarily into the stream above the head of his ditch—if he gets the quantity to which he is entitled, thereby substantially permitting the substitution of an artificial flow if it can be done without damage (providing the party substituting an artificial flow sustains the burden of proof which is upon him) that he will not now, or in the future, damage the prior appropriator; for if he does not plead and prove this, or if his plan has any element of doubt, it will be unlawful * * *.

"The right to exclusive use carries with it such right to exclusive flow as is necessary to preserve the appropriator's use without damage to his use; but it is not violated by any act that does not interfere wih his use of the water. The right to the flow is subordinate to the right of use, and cannot exceed it. The principle (quoting from Pomona [Land &] Water Co. v. San Antonio Water Company, 152 Cal. 618, 93 P. 881) in brief, is this: 'That where one is entitled to a given amount of water at a given point, he may not complain of any prior use made of the water which does not impair the quantity or quality to which he is entitled, and on the other hand, he may not lay claim

6. Frank J. Trelease, Water Conference, University of Texas, p. 206.

to any excess of water over the amount to which he is entitled, however it may be produced.'" Wiel, "Water Rights in the Western States (3rd Ed.), § 279.

Upon examination of the authorities cited by Wiel, we find that in Morris v. Bean, 146 F. 423, 435 which was a decision of the Circuit Court for the District of Montana, the District Judge in using the phrase mentioned by Wiel in his text was speaking of the claim of an upstream junior appropriator to take water to the detriment of a downstream senior appropriator. The statement in context is as follows:

"The (senior) appropriators (the complainant and intervener) took with the right to have the stream continue to flow as it was wont to flow, and to remain in the condition in which they found it, and whenever water is diverted above it keeps back that which would otherwise reach them, and the more water that is kept back the less will the complainant and intervener have. But for the wholesale diversions by defendants the water would reach them later in the season, and abide longer, and this is what their appropriations entitled them to."

On the other hand in Schodde v. Twin Falls Land and Water Co., 161 F. 43, affirmed 224 U.S. 107, 32 S.Ct. 470, 56 L.Ed. 686, the Ninth Circuit Court of Appeals, discusses means of raising water in a stream for purposes of diversion and attendant legal problems, particularly insofar as the sovereign and the nature of the grant are concerned. The Court said:

"The permission here given is a mere license to the owner of lands adjacent to a stream to use any appropriate method for raising the water to a level above the banks for distribution upon such adjacent lands, but it is immaterial to the state what particular method is used. The landowner may use a ram, a pump, or a wheel, or he may raise the water by means of a ditch. And he may change from one method

to another as the situation or circumstances may require. Charnock v. Higuerra, 111 Cal. 473, 476, 44 Pac. 171, 32 L.R.A. 190, 52 Am.St.Rep. 195. The method adopted cannot be said to have attached as appurtenant to the appropriation as against other appropriators of water from the same stream. Perhaps in a conveyance of land having upon it or in the adjacent stream a ram or other machine for raising water from the river such a machine would pass to the grantee of the lands under a deed containing the term 'appurtenances,' but that would be a very different proposition from the one now under consideration. We are, therefore, of opinion that the means of utilizing the current is not attached as appurtenant to the appropriation."

The privilege of placing a dam in a stream when given its broadest implication can amount to no more than a mere license. Insofar as the sovereign is concerned there is no transfer of title to the dam or the portion of the stream bed occupied by it. While those holding under the grants have a right to receive water in the ditch, they have no vested rights in and to the means whereby the water is conveyed to the ditch. Hence they have no vested right in the channel of the river remaining in any particular geographic position. A change in channel would simply mean a change in method or process whereby water is conveyed to the ditch. It amounts to no more than a change in the point of diversion.

In the recent Colorado case of City of Colorado Springs v. Yust, 126 Colo. 289, 249 P.2d 151 the right of an appropriator to change the point of diversion is spoken of as a right which exists independently of statute. It was said that:

"The inherent right to change the point of diversion includes not only the right to change without condition, if such change can be made without substantial injury to the vested rights of others, but also the right to change sub-

ject to conditions, if injury to rights of others may thereby be avoided."

The rule thus stated should be applied here.

We may of course examine the facts that were in existence at the time the grants were made in order to determine the parties' rights relating thereto. The pertinent facts are as follows: The sole source of water to supply the San Juan Ditch was and is the San Antonio River. There was in existence before and at the time of the grant a device for raising the water level in the river to a point where it would flow into the San Juan Ditch. A consideration had been paid by the grantees to the sovereign for their dulas of water in the ditch. These three elements under our conception of economic fair dealing—viewed from either a common law or a civil law standpoint, lead to the conclusion that the sovereign should not destroy the dam which was then being used to supply the ditch with water unless some other means were devised whereby water from the river could be obtained to supply the needs of the ditch, or some compensation were paid because of the destruction of the dam. At the present time a means is being provided for supplying the ditch with water which does not involve the use of the dam. As long as water is supplied by the present existing means or some other means at a cost which did not exceed the cost of maintaining the dam theretofore borne by respondents, there can be no invasion of respondents' property rights. While it may not be definitely determined what course the Authority will pursue in the years to come, it is indicated by affidavits in the record that pumping is a reasonable method for meeting respondents' demands for water and the trial court concluded that pumping was feasible.[7] However that may be, it would seem that unless and until there is a failure of water in the

San Juan Ditch, no property rights of respondents have been either taken or diminished. An appropriative right to water represents a cession of the use of public waters for private purposes. Article 16, § 59 of the Texas Constitution. So long as the sovereign abides by the terms of the cession, it cannot be held liable in damages for a change in methods by which the letter of the cession or grant is fulfilled. As, if and when waters are not delivered to the ditch a problem might then arise as to respondents' damages but that matter is not presently before us.

I respectfully dissent from the order affirming the judgment of the Court of Civil Appeals.

SMITH, CULVER and STEAKLEY, JJ., join in this dissent.

---

7. What has been said above is not based upon an agreement that pending this litigation, the Authority should supply the ditch with water through pumping operations. This agreement was executed without prejudice to the litigants. The trial court did however conclude as an undisputed fact that pumping was feasible and in this he is supported by the affidavits in the record.