In re the ADJUDICATION OF the WA-
TER RIGHTS IN the MEDINA RIVER
WATERSHED OF the SAN ANTONIO
RIVER BASIN.

No. C–1914.

Supreme Court of Texas.

May 2, 1984.

Rehearing Denied June 20, 1984.

Jim Mattox, Atty. Gen., Jim Mathews and R. Lambeth Townsend, Asst. Attys. Gen., Austin, for petitioner.

Foster, Lewis, Langley, Gardner & Banack, Ralph Langley and William T. Armstrong III, William H. Robison, San Antonio, for respondent.

SPEARS, Justice.

This is an appeal from an adjudication of the water rights in the Medina River watershed of the San Antonio River. The Texas Water Commission, acting under the Texas Water Rights Adjudication Act, TEX. WATER CODE ANN. §§ 11.301–11.341, determined that O.R. Mitchell was entitled to divert 89.15 acre/feet of water annually from Medio Creek.[1] The Commission then initiated judicial review of that order under TEX. WATER CODE ANN. § 11.317, and Mitchell filed exceptions thereto. TEX. WATER CODE ANN. § 11.318.[2] The district court rendered judgment that Mitchell was entitled to impound all of the water flowing in Medio Creek. The court of appeals affirmed, one justice dissenting. 645 S.W.2d 596. We reverse the judgments of both courts and affirm the determination of the Texas Water Commission.

O.R. Mitchell held title to 1351 acres of land, known as the Mitchell Ranch, in southwest Bexar County. Title to this land was derived in part from an 1833 grant by the Mexican state of Coahuila y Texas to Francisco Ricardo Hernandez; the rest of the ranch was derived from various common-law grants. The Hernandez grant made no mention of any water rights. Medio Creek, a non-perennial stream, crosses the Mitchell ranch through the portion derived from the Hernandez grant. In 1945, Mitchell erected a dam on Medio Creek, creating a lake of approximately 60 surface acres and 330 acre/feet. Since that time, Mitchell has impounded all of the water in the creek.[3]

In 1967, the Texas Legislature enacted the Water Rights Adjudication Act, now codified at TEX. WATER CODE ANN. §§ 11.301–11.341.[4] Under § 11.303 of the Act, all claims to water rights except those evidenced by permits issued by the state or certified filings under the 1913 Irrigation Act are limited to the maximum amount of water beneficially used in any one year from 1963–1967. Section 11.303 also requires that a sworn statement evidencing such claim must have been filed prior to September 1, 1969.

Pursuant to § 11.303, Mitchell filed a claim to impound 300 acre-feet of water in a reservoir on Medio Creek, and to divert 518 acre-feet of water from the creek for irrigation. After holding a number of hearings, the Commission entered its Final Determination granting Mitchell a right to divert 89.15 acre-feet for irrigation; Mitchell was denied any right to impound water. This allotment was based on the amount of water that Mitchell had been using to irrigate the common-law portion of his property during the statutory period of 1963–1967. Mitchell then filed an application for rehearing to the Commission, a prerequisite to appealing to the district court.

---

1. O.R. Mitchell died in 1978 during the pendency of the proceeding before the Commission. The Alamo National Bank, the executor of Mitchell's estate, filed the exceptions to the final determination. For the sake of clarity, we shall refer to the claimant as "Mitchell."

2. At the time of these proceedings, the Water Rights Adjudication Act was codified in Chapter 5 of the Water Code. In those cases in which the Act has been moved to Chapter 11 without change, we will use the current citation.

3. Because of the introduction of effluent from several upstream sewage treatment plants, Medio Creek may now flow constantly. The Commission does not contend, however, that for purposes of this appeal Medio Creek should be considered as anything but a non-perennial stream.

4. For an excellent discussion of the Water Rights Adjudication Act, see D. Caroom and P. Elliott, *Water Rights Adjudication—Texas Style,* 44 Texas Bar J. 1183 (1981).

TEX. WATER CODE ANN. § 11.320. The sole basis for complaint in Mitchell's application for rehearing was that he owned the water of Medio Creek by virtue of the Hernandez grant, and therefore the existing use limitation of § 11.303 did not apply to him. When his application for rehearing was denied, Mitchell filed an exception to the determination in the district court. TEX. WATER CODE ANN. § 11.318. Again, Mitchell's complaint was based on the theory that he owned the water. Under § 11.320 of the Act, "[t]he [district] court shall not consider any exception which was not brought to the commission's attention by application for rehearing." The issue before this court, therefore, is actually a quite narrow one: Did the grant of land to Francisco Ricardo Hernandez carry with it an implied grant of the waters in Medio Creek?

■ The court in *State v. Valmont Plantations*, 346 S.W.2d 853 (Tex.Civ.App. —San Antonio 1961), *opinion adopted* 163 Tex. 381, 355 S.W.2d 502 (1962), held that Spanish and Mexican land grants did not carry with them water rights, and that in the absence of a specific grant, waters remained within the royal domain. Mitchell contends, and the court of appeals agreed, that *Valmont* does not apply to this case, the rule there being applicable only to perennial streams. *See Valmont*, 346 S.W.2d at 860, n. 14. Under Mexican law, Mitchell asserts, the rights to water in non-perennial streams went with the adjacent land. We agree with Mitchell that, although *Valmont* represents an exhaustive study of the general subject involved here, it does not answer the precise question in this case. We disagree with the conclusion, however, that Mitchell therefore owns all the water in Medio Creek.

■ The law controlling this case is the law of the granting sovereign—that is, Mexico. *Kraft v. Langford*, 565 S.W.2d 223 (Tex.1978); *San Antonio River Authority v. Lewis*, 363 S.W.2d 444 (Tex. 1963). That law is not foreign law; as the law of the former sovereign, it is Texas law, which Texas courts have a duty to

know and to follow. *Valmont*, 346 S.W.2d at 855. If the Ricardo grant carried with it ownership rights under Mexican law to the waters of Medio Creek, those rights cannot be taken away from Mitchell, Ricardo's successor, without compensation. *San Antonio River Authority v. Lewis*, 363 S.W.2d at 449.

In determining what Mexican law on this subject was, however, we must go back a number of steps. The parties agree that the Mexican law of 1833 provides no answer to the question involved in this case. In 1833, any gaps in Mexican law were filled by reference to the laws of Colonial Spain, or what Spaniards knew as the Indies. The primary source of the law of Colonial Spain is the *Recopilacion de las leyos de Indias* (1680) ("R.I."). Book 2, Title 1, Law 1 of the *Recopilacion* provides that when colonial law is silent on a topic, one must look to the laws of Peninsular Spain. Thus, the law governing Colonial Spain is commonly referred to as the law of Castile and of the Indies. The most comprehensive source of Spanish law, and the one most likely to answer our question, is *Las Siete Partidas*, enacted in 1286. *Valmont*, 346 S.W.2d at 859 n. 13; S. Scott, *Las Siete Partidas* liii (1931). Mitchell contends that the law of Colonial Spain, i.e. the *Recopilacion*, is silent on this question, and therefore we must look to the law of Peninsular Spain, as embodied in *Las Siete Partidas*.

The *Partidas* does not contain a provision saying specifically that non-perennial streams are private. There are, however, a number of sections dealing with waters. Partida III, Title XXVII, Law vi, for instance, says that "*Rivers*, harbors, and public highways belong to *all persons in common*." (Emphasis added). Mitchell contends that this provision and others similar to it indicate a distinction between rivers, which would be public, and smaller watercourses, which would be private.

■ Mitchell admits, however, that Spanish law in itself is less than clear on the subject. In any event, we need not decide the state of Spanish law, for we are

convinced that the distinction between public and private watercourses did not exist in New Spain, nor in Mexico in 1833. New Spain, including what is now Texas, was owned by the Crown of Castile by virtue of the Bull of Donation, also known as the Bull *Inter Cetera*, of Pope Alexander VI, dated May 4, 1493. R.I., Book 3, Title 1, Law 1. As a consequence, New Spain, indeed all Colonial Spain, was the private property, or *realengo*, of the King.[5] *Valmont*, 346 S.W.2d at 859; J. Vance, *The Background of Hispanic-American Law* 129 (1943). One could own property in New Spain only by virtue of a grant from the Crown. R.I. 4, 12, 14. It was a fundamental principle of Spanish law that grants of property rights were not to be inferred. As Cabrera put it, "When a title of land did not mention waters, a right of water was never considered to exist, solely by reason of proximity or accession." *Quoted in* A. Enriquez, *Los Grandes Problemas Nacionales* (1909) 171–172. It follows, then, that the distinction between public and private water did not exist.

This conclusion is borne out by the *Recopilacion* and by events surrounding the enactment of certain of its provisions. The motivating factor behind the Bull *Inter Cetera* was to bring Christianity to the New World. Many Spaniards found this goal inconsistent with enslavement or mistreatment of the Indians. A number of laws were enacted protecting basic Indian rights. *See* S. Tyler, *The Indian Cause in the Spanish Law of the Indies* (1980). The Indianist movement reached its height in the 1540's, with the publication of the "New Laws," which concerned themselves with problems stemming from Indian-Spanish conflict, S. Tyler, *supra*, at xlii, and sought to overturn the system of vested rights for Spaniards and total subjection of Indians. J. Vance, *supra*, at 148.

In the midst of this Indianist sentiment occurred an event particularly revealing for our purposes. In 1529, Hernan Cortes, conqueror of Mexico, by royal grant received title to a large territory in central Mexico. That grant carried with it, among other things, rights to "running, stagnant, and percolating waters." The gift caused a protest from the *Audiencia* of New Spain.[6] The *Audiencia* suggested a provision that the waters of estates granted in the Indies were to be common to Spaniards and Indians. This provision was eventually issued as a *cedula*, which was later codified at R.I. 4, 17, 7. An even more sweeping provision, eventually codified at R.I. Book 4, Title 17, Law 5, was issued eight years later: "We command that the use of all the pastures, woods, and waters of the provences of the Indies be common to all the citizens of them." No distinction was drawn between public and private water. This provision was subject only to the right of the Viceroys and *Audiencias* to provide for the management of water, R.I. 4, 17, 9 (1532), especially with regard to irrigation. R.I. 4, 17, 11 (1536).

The writings of commentators also support our conclusion that the distinction between private and public waters did not exist in Colonial Spain. Juan de Solorzano y Pereyra, one of the compilers of the *Recopilacion*, refers to the Crown's general rights in "public waters" as *realengo*. J. Solorzano y Pereyra, 6 *Politica Indiana* ch. 12, § 1. Yet, when writing specifically about the Indies, Solorzano speaks of "waters" as *realengo*. *Id.*, § 3. Luis Cabrera wrote that "In New Spain the distinction of Spanish Peninsular Law between public and private rivers was never in force, nor did colonial law contemplate rivers as things distinct from the waters, because it was the property of the Crown." A. Enriquez, *Los Grandes Problemas Nacionales*

---

5. These rights passed from the crown to the public domain by the Cadiz Constitution in 1812, and to Mexico with its independence in 1821. Nevertheless, because there was no provision of positive Mexican law in 1833 dealing with this question, Spanish law, including the law of New Spain, controls.

6. The *Audiencia* was the governing body of New Spain, serving both as an appellate court and as a council of state.

(1909) quoted in *Valmont,* 346 S.W.2d at 862. In that same book, Andres Molina Enriquez, the author, concluded that "the accession of the waters of a creek to the land in which it rises or to the lands through which it passes, is an absurdity rejected by common sense."

The court of appeals strongly relied on *McCurdy v. Morgan,* 265 S.W.2d 269 (Tex. Civ.App.—San Antonio 1954, writ ref'd), in reaching a contrary result. *McCurdy* held that the bed of a non-perennial stream belongs to the adjacent landowner. We do not believe that principle dispositive of the rights to the water in a non-perennial stream. It was the law of New Spain that any gaps in the *Recopilacion* were to be filled by reference to the laws of the Peninsula. There was no provision in the *Recopilacion* concerning the ownership of the beds of nonperennial streams. So, Spanish law, which held that the bed of a non-perennial stream was private, applied. As to the waters of the stream, however, there was no need to refer to the law of Castile. As noted above, the *Recopilacion* held that waters were to be common to all. In fact, it has been said that the *Recopilacion* is a collection of exceptions to the law of Peninsular Spain. J. Vance, *supra,* at 163. Thus, even if Spanish law specifically provided for the public water/private water distinction, our conclusion would be the same.

Mitchell also points to the absence in Mexican land records of any express grants of water in non-perennial streams as an indication that such grants were not necessary. We do not find this evidence persuasive. No such grant was needed to take water even from a public stream for domestic or personal use. *See* de la Vega, *Reglamento General de las Medidas de Aguas, reprinted in* M. Galvan, *Ordenan-*

*zas de Tierras y Aguas* (1844) 155–157. It was only for irrigation that a grant was needed. In that light, there are other explanations as to why no such grants appear. It may have been that, under the technology of the mid-19th Century, waters such as those of Medio Creek simply were not useful for irrigation.[7]

▮ There is another reason why the Water Commission was correct in restricting Mitchell's rights to existing use. The state asserts, and Mitchell concedes, that even under the construction of Spanish law most favorable to Mitchell, a landowner could not use private water in such a way as to injure downstream landowners. If, for instance, a downstream landowner needed water for irrigation, the upstream user could not take all the water. *Cf.* Partida III, Tit. XXXII, Laws XV, XVI. On the other hand, Mitchell also admits that non-adjacent landowners would have had a right to cross the adjacent land in order to use the water in the non-perennial stream for domestic uses and for watering cattle. In other words, what Mitchell is claiming is essentially a usufructory right—an entitlement to use the water without actual ownership of it. In this respect, the right claimed is similar to a riparian one. Although a riparian does not owe any duty to non-adjacent landowners, he cannot cut off downstream riparians. We recently held that the state can constitutionally regulate riparian rights. *In Re the Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin,* 642 S.W.2d 438 (Tex.1982). Thus, even if Mitchell is correct in claiming that a distinction between private and public waters existed in New Spain, he would not be entitled to impound all the waters of Medio Creek.

7. The grants examined by Mitchell are recorded in Cosme Garza Garcia's *Pronturio de Leyes y Decretos del Estado de Coahuila y Zaragoza* (1902). We note that all of the decrees examined by Mitchell dated after the year 1864, long after both Texas's independence and Ricardo's grant. Moreover, the Commission claims to have found several grants of water from non-perennial streams. The court of appeals did not consider these decrees, because they were not introduced at trial. Because we are not persuaded by Mitchell's use of this material, we do not reach the issue of whether the court of appeals should have taken judicial notice of the decrees presented by the Commission.

■ We hold that the Texas Water Commission was correct in determining that Mitchell did not own the waters of Medio Creek, and thus, the Commission correctly granted Mitchell a permit only for the water to which he was entitled by way of existing use under the Water Code.

The judgments of the courts below are reversed, and the determination of the Texas Water Commission is affirmed.