In re the ADJUDICATION OF WATER RIGHTS IN the MEDINA RIVER WATERSHED OF THE SAN ANTONIO RIVER BASIN (Claim of O.R. Mitchell Estate)

v.

ALAMO NATIONAL BANK INDEPENDENT EXECUTOR, Claimants.

No. 16664.

Court of Appeals of Texas, San Antonio.

Dec. 31, 1982.

Rehearing Denied Feb. 2, 1983.

Douglas G. Caroom, Philip Haag, Asst. Attys. Gen., Austin, for appellant.

Ralph Langley, William T. Armstrong, III, William Robison, San Antonio, for appellee.

Before CLARK, BASKIN and REEVES, JJ.

## OPINION

BASKIN, Justice.

This is a water rights adjudication case. The 224th District Court, Bexar County, Honorable Richard Woods presiding, entered a judgment holding that the Estate of O.R. Mitchell, deceased (Mitchell), was entitled to capture and use all of the water flowing in the non-perennial stream known as Medio Creek, as the same enters and crosses property owned by the estate of Mitchell. The State of Texas on behalf of the Texas Water Commission (Commission) brings this appeal.

By its first point of error the Commission claims that the trial court lacked jurisdiction to hear Mitchell's appeal of a Modified Final Determination of water rights in the Medina River watershed. The Commission, pursuant to the Texas Water Rights Adjudication Act, Texas Water Code, Tex.Water Code Ann. § 11.301 (Vernon Supp.1982) (Adjudication Act), conducted an administrative hearing to determine the water rights of Mitchell, et al., in the Medio Creek situated in the Medina River watershed of the San Antonio River basin. The Commission entered an order of Final Determination on December 5, 1977. Dissatisfied with the order of Final Determination, Mitchell and a group of claimants, known as the Walsh family, timely filed an application for rehearing. On February 14, 1978, the Commission entered its order which overruled in toto the application for rehearing of Mitchell and granted, in part, the application for rehearing of Walsh. Mitchell did not participate in the subsequent hearing. On May 23, 1978, the Commission rendered its Modified Final Determination which was identical to the earlier Final Determination as to Mitchell. Pursuant to § 11.317(a) of the Water Rights Adjudication Act, the Commission initiated ju-

dicial review, and Mitchell filed his contest. Tex.Water Code Ann. § 11.317(a) (Vernon Supp.1982).

Commission contends that since Mitchell did not file a motion for rehearing to the Modified Final Determination Order, the trial court lacks jurisdiction to hear Mitchell's exceptions to the order. In support of its contention it cites § 16(c), the Administrative Procedure and Texas Register Act (APTRA).

A decision is final, in the absence of a timely motion for rehearing, on the expiration of the period for filing a motion for rehearing, and is final and appealable on the date of the rendition of the order overruling the motion for rehearing, or on the date the motion is overruled by operation of law....

Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 16(c) (Vernon Supp.1982).

The Tex.Water Code § 11.320(a), the statute that authorizes judicial review in the Adjudication Act provides:

In passing on exceptions, the Court shall determine all issues of law and fact independently of the Commission's determination. The substantial evidence rule shall not be used. The Court shall not consider any exception which was not brought to the Commission's attention by application for rehearing.

Tex.Water Code Ann. § 13.320(a) (Vernon Supp.1982). The Commission acknowledges that it has been unable to find any direct authority construing § 11.320(a), but asserts that § 16(c), APTRA, and § 11.320(c) of the Water Code provide authority to sustain its contention that the trial court lacked jurisdiction because of Mitchell's failure to file a motion for rehearing to the Modified Final Determination Order. We disagree. The jurisdictional condition that the district court "shall not consider any exception which was not brought to the Commission's attention by application for rehearing" was met. The Commission entered its Final Determination Order, Mitchell filed an application for rehearing, and it was overruled. The obvious purpose of the application for rehearing was to call the

Commission's attention to any error or failure in the Commission's ruling before burdening the parties and the judicial system with a district court hearing on the same matter. This is reinforced by § 11.320(a) which provides that "the court shall not consider any issue of fact raised by an exception unless the record of evidence before the Commission reveals that the question was genuinely an issue before the Commission." Tex.Water Code Ann. § 11.320(a) (Vernon Supp.1982). Appellant fails to show any good reason why Mitchell would be required to file another motion for rehearing in a hearing in which he did not, and indeed could not, participate.

There were more than one hundred claimants in the Medina River Watershed proceedings. We cannot accept an argument that if each of them wished to appeal, it would be necessary for each of them to file a second motion for rehearing because the Commission decided to reconsider its ruling as to a single claim. The law does not require a useless act. The purpose of APTRA is set forth in section 1 of the Act:

It is the declared public policy of this state to afford minimum standards of uniform practice and procedure for state agencies ... to provide adequate and proper notice of proposed agency rules ... and to restate the law of judicial review of agency action.

Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 1 (Vernon Supp.1982).

Section 4(a) of APTRA states in part:
In addition to other rule making requirements imposed by law, each agency shall:
(1) Adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available.

*Id.* § 4(a).

The Act also provides for the publication of the rules adopted by the agency, and that the contents shall be judicially noticed and constitute prima facie evidence of the text of the documents.

The Commission has adopted rules for its administrative hearings. Several provisions of the administrative code governing pro-

ceedings before the Water Commission are pertinent. 31 Tex.Admin.Code, § 261.-1.[1] There is no provision under the Commission's rules which requires a motion for rehearing of any Modified Final Determination.

We are of the opinion that the Adjudication Act also supports appellee's position that it was not necessary, nor perhaps even permissible, to file a motion for rehearing to the Modified Final Determination. Section 11.315 of the Act provides that on completion of the hearings the Commission shall make a Final Determination and a copy of its Order and any modifications of that Final Order should be sent to each claimant whose rights are adjudicated and to each contesting party. Tex.Water Code Ann. § 11.315 (Vernon Supp.1982). The statute then provides for an application for

rehearing to a final order without mention of a Modified Final Determination.[2]

We find that Vernon's Annotated Civil Statutes art. 5429b–2, Code Construction Act, also lends support to appellee's position. The Act provides that the courts may consider in construing a statute the objects sought to be obtained. Tex.Rev.Civ.Stat. Ann. art. 5429b–2, § 3.03 (Vernon Supp. 1982). It is our opinion that the object of the statute was to provide for a full, fair, and complete hearing at the administrative level with the right of appeal to the court. We think this has occurred. Appellant's first point of error is overruled.

The Commission contends in its second point of error that the trial court erred in finding that Mitchell had any water rights based upon a civil law grant. Mitchell's title is based upon a grant made to Francis-

1. Section § 261 provides that the purpose of the rules are to:
   establish reasonable procedures for the institution, conduct, and final determination of matters before the Commission in order to avoid delays, save expense, and facilitate the just administration and enforcement of the water laws of the State . . . .
   Tex.Admin.Code § 261.
   A motion for rehearing shall include a concise statement of each allegation of error.
   *Id.,* § 273.1
   (c) *Notice of final determination.* The commission shall send a notice of the final determination by first-class mail to each claimant of water rights within the river basin in which the segment is located, . . . .
   (1) Each notice shall state the following:
   * * * * * *
   (B) The method of ordering copies of the final determination and the cost of copies.
   (C) The date by which applications for rehearing must be filed, which shall be not less than 30 days from the effective date of the final determination.
   (d) *Application for rehearing of final determination.* An application for rehearing is the same as a motion for rehearing under Texas Civil Statutes article 6252–13a, § 16 and is a prerequisite to filing an exception to the final determination under Texas Water Code § 11.318 et seq.
   (1) Within 30 days after the effective date of the final determination, any affected party may apply to the commission for a rehearing . . . . Within 45 days after the effective date of the final determination, the commission shall take action either granting or denying the applications for rehearing . . . .

2. The Act provides:

* * * * * *
(3) If the final determination is modified after a rehearing, the commission shall send a copy of the modified final determination by regular mail to each person on the department's official mailing list for the *segment being adjudicated.* However, if the modifications are such that they are likely to substantially affect the rights of other water right holders within the basin but outside the watershed or segment being adjudicated, then a summary of the modifications shall also be sent to all other water right holders in the basin.
*Id.,* § 275(a)(c).

Section 11.316. Application for Rehearing: Within 30 days from the date of final determination, any affected party may apply to the commission for a rehearing. Applications for rehearings which in the opinion of the commission are without merit may be denied without notice to the other parties, but no application for rehearing shall be granted without notice to each claimant whose rights are adjudicated and to each contesting party.
Section 11.317. A Filing and Final Determination with the District Court.
(a) As soon as practicable after the disposition of all applications for rehearing, the commission shall file a certified copy of the final determination . . . in the district court of any county in which the stream or segment under adjudication is located . . . .
Tex.Water Code Ann. (Vernon Supp.1982).

co Ricardo Hernandez. By instrument dated October 15, 1829, Ricardo petitioned the chief of the Department of Texas of the State of Coahuila and Texas for a decree that a league of land in the vicinity of the Medina River, on the left margin of said river and below the La Carne crossing in the direction of the city of Bexar, be granted to him. By instrument dated March 8, 1830, in conformity with the provisions of the State Colonization Law of March 24, 1825, and by virtue of the report given by the Ayuntamiento (Council) of the city of Bexar, Ricardo was conceded, as a settler, one league of land which he requested at the aforesaid place, provided the requested tract was vacant and did not belong to any other persons. The Commissioner General, whom the governor had appointed, would put him in possession of the league and issue corresponding title, first classifying the kind and quality of the aforesaid tract to determine that which he should pay the State for it under the terms designated by article 22 of the colonization law. On November 29, 1833, Manuel Ximenes, First Regidor of the Ayuntamiento of the city of Bexar and Constitutional Interim-Alcalde of same, ordered that Ricardo's petition be passed to the surveyor Byrd Lockhart so that he could proceed to make the survey of the league which the Supreme Government of the State had conceded to Ricardo. In that instrument Ximines noted, ". . . the Medina River, where it is to be located, is not one of permanent running water . . ."

On December 3, 1833, Manuel Ximenes, again acting as First Regidor of the Ayuntamiento and sole Interim-Alcalde, issued original title to one league of land in favor of and in the name of Francisco Ricardo, the title providing that as legal owner he, his children, heirs, and successors could possess, and enjoy freely the tract with all of the uses, customs, and appurtenances. The instrument pointed out that it had been surveyed by the surveyor appointed by Ximenes, Byrd Lockhart, and that he, in such instrument, classified the land as pasture land and calculated that in its entirety there were no more than three labors for the purpose of cultivation. The title docu-

ment required Ricardo to pay the State at the rate of thirty pesos for the league and twenty reales for each of the three labors of arable land as prescribed in the Colonization Law No. 16 of March 24, 1825, in article 22.

It is undisputed that O.R. Mitchell, prior to his death, owned a ranch of approximately 1351 acres located in southwest Bexar County and that his title to that portion of the Mitchell ranch involved in this lawsuit was directly traceable to the above described land grant to Francisco Ricardo Hernandez by the Mexican State of Coahuilla and Texas in 1833. At the time of the grant of the land and the title Medio Creek traversed the land grant and cut the boundaries in two places. It was undisputed and indeed agreed by the parties that at the time of the 1833 grant Medio Creek was a non-perennial stream and flowed only when it rained in southwest Bexar County and in the watershed of Medio Creek.

In 1945, O.R. Mitchell erected a dam on Medio Creek near the south portion of his ranch and thereby created a lake of approximately 60 surface acres or 330 acre feet. Water from Medio Creek, surface waters, and water from artesian wells dug on the ranch filled the lake. At the time of the construction of the dam Medio Creek continued to be a non-perennial stream and flowed only when it rained in southwest Bexar County.

Commencing in the early 1960's several sewage treatment plants to the north of the Mitchell Ranch began to introduce sewage effluent into Medio Creek's stream bed. This resulted in a virtually constant flow of water and effluent in the stream bed. It is undisputed that if the sewage effluent were not introduced into the stream bed north of the Mitchell ranch, Medio Creek would remain a non-perennial stream and would flow only when it rained in southwest Bexar County.

Mitchell's ownership of or right to use water in Medio Creek rests upon the title or right which Ricardo Hernandez obtained when he received possession and title to the land from the State of Coahuila and Texas

in 1833. We rest our conclusion upon what Justice Pope described as a solid premise that grants from Spain, Mexico, and Mexican States were governed by the law of the sovereigns when the grants were made. *State v. Valmont Plantations,* 346 S.W.2d 853, 855–857 (Tex.Civ.App.—San Antonio 1961) *opinion adopted* 163 Tex. 381, 355 S.W.2d 502 (Tex.1962). We have found no Texas case which has decided and applied the law of the State of Coahuilla and Texas to determine title or right to capture and use water in a non-navigable and non-perennial stream which ran only after rains.

The Commission relies heavily upon, and asserts that it based its decision upon, the exhaustive and erudite decision in *Valmont Plantations.* That was a class action to determine whether in the absence of specific grants of irrigation waters, Spanish and Mexican land grants along the lower Rio Grande had appurtenant riparian irrigation rights, and it was a suit between appropriators and riparians. Justice Pope commenced his research by an examination of the laws of Peninsular Spain, New Spain, Mexico before Texas independence, and Mexico after Texas independence. He concluded from each of those sources that "Spain and Mexico did not recognize *riparian irrigation rights in navigable river waters." Valmont Plantations* at 857 (emphasis added). Justice Pope began with a study of *Las Siete Partidas,* published in 1263, which was recognized as the essence of the law of Peninsular Spain after 1348. In that regard Justice Pope wrote at page 857:

> It stated that the *waters of navigable rivers* for stated purposes may be used by all persons in common. Among those uses were navigation, mooring of boats, making repairs on ships or sails, landing merchandise, fishing and drying nets. Laws 3 and 6, Title 28, Part 3, Las Siete Partidas. Other later laws recognized these same common uses. Law 5, Title 17, Book 4, Recopilacion; 2 White Recopilacion 56; Art. 56, Title 2, Book 4, Constitutiones de Cataluna; Law 11, Rubrica 12, Book 9, Fueros de Valencia. (Emphasis added.)

Looking to the law of New Spain, Justice Pope relied upon *Recopilacion de las Leyes de las Indias,* a compilation of decrees from the Council of the Indies. *Recopilacion* made clear that the King intended that *waters from rivers* were for the common use of all men unless and until there was a title from the King. In a footnote, however, it was noted that springs and waters originating on lands, unlike river waters, went with the land, citing *Las Siete Partidas.* In considerable understatement, the writer said, "This distinction has sometimes confused modern writers."

One of the most important observations in the *Valmont Plantations* opinion was:

> Land classification was a distinct quality of the Spanish laws and the classifications distinguished between irrigable and non-irrigable lands, Law 14, Title 17, Book 4, Recopilacion; 2 White, New Recopilacion, 47, lands useful for irrigation and lands useful for stock raising, Laws 8, 18, Title 12, Book 4, Recopilacion, 'cultivated lands' and 'pastures', Law 9, Title 5, Book 4, Recopilacion.

346 S.W.2d at 860. The record reflects that the Ricardo Hernandez grant contained no irrigable land, a small amount of non-irrigable land, and consisted largely of pasture or grazing land.

Turning to his discussion of the Mexican law after Mexico won her independence from Spain in 1821, Justice Pope said:

> Mexican legislation reveals a non-riparian system. Lands were classified by the Mexican national government and by the State of Tamaulipas, as lands for farming with irrigation, farming without irrigation, or for grazing. The classification determined the purchase price paid for the land as well as the quantity of land granted. Tamaulipas made an additional classification of pasture lands, depending on whether it had the 'benefit of running water.'

346 S.W.2d at 863. The classification of lands by Coahuila and Texas was essentially identical.

Justice Pope recognized that classifications of land on petition of the colonists was evidence that irrigation was not intended. As he commented, the classification controlled the quantity of land the settlers would receive and the price they would pay. Lands were classified as pastures, arable, or irrigable lands. The colonists by way of compensation for their failure to receive irrigable lands, received pastures greater in area. Justice Pope continued, "The conclusion that the King intended to grant irrigation lands, after the classifications denied that quality, is contrary to the facts and the grants made in accord with the King's former decrees." 346 S.W.2d at 873. The same was true of subsequent Mexican grants, and, as will be more fully discussed, the laws of Coahuila and Texas classified and limited the quantity of lands and fixed a different price on each classification.

We assert that *State v. Valmont Plantations, supra,* did not decide the central question in this cause, and we are not bound by the rules of stare decisis to apply the rule enunciated in *Valmont Plantations* in the instant case. Indeed, in our view, an application of the rule of *Valmont Plantations* to the facts of this case would in reality be an unwarranted extension of that rule to entirely different facts.

In further support of its position, the Commission cites us to *Hoefs v. Short,* 114 Tex. 501, 273 S.W. 785 (1925). We do not believe that *Hoefs* supports the Commission's contentions. First, the court there was dealing with an area in west Texas and applying the law of riparian rights, a device of the common law; Mexican land grants and civil law were not involved. Second, the court rejected the defendant's contention in that case that the waters of Barilla Creek were surface waters to which water rights did not attach. Ricardo Hernandez received land from Coahuila and Texas which was described as pasture land and arable land but not irrigable land. We reject *Hoefs* as authority to overrule the judgment of the trial court. In addition the Commission cites us to this court's opinion in *Adjudication of Water Rights of Cibolo Creek,* 568 S.W.2d 155 (Tex.Civ.App.—

San Antonio 1978, no writ). We find nothing in that opinion to inform us whether Cibolo Creek was a perennial or non-perennial stream, and we find nothing in that opinion that reflects the classification of the land which was granted by the Mexican or Spanish government. We are told, however, that the claimant's tracts had been irrigated with water from Cibolo Creek for many years, suggesting that the claimant's predecessor may have received a grant of irrigable land.

The claimant Mitchell refers us to the opinion in *McCurdy v. Morgan,* 265 S.W.2d 269 (Tex.Civ.App.—San Antonio 1954, writ ref'd). That case involved a dispute of title between the successors of John Pollan, who in 1834 received a grant embracing within its limits a portion of the bed of a non-perennial stream (Chiltipin Creek) from the executive authority of the Mexican State of Coahuila and Texas, and those claiming under an oil and gas lease (covering the creek bed) executed by the Land Commissioner of the State of Texas. The controlling question was whether title to the bed of the non-perennial stream remained in the sovereign or passed to the grantee under the Mexican grant. The court noted that it was well settled under applicable Mexican civil law that title to the bed of perennial streams remained in the sovereign.

The trial court had granted a summary judgment to appellee, the successor in title to Pollan. The appellants argued that the law and policy of Spain and Mexico under which title to streambeds was held by the sovereign in trust for the people, were not grounded solely upon usefulness of streams for navigation, but also on the basis of usefulness of water for purposes of irrigation. They argued that because Chiltipin Creek carried water within defined banks which sometimes could be used for irrigation, the title to the creek bed vested and remained in the sovereign. On appeal, Justice Norvell wrote:

It seems that under the basic Mexican civil law the doctrine of sovereign ownership to the beds of streams applied only

to perennial streams. Juan Sala, Sala Mexicano, 3d Ed. (1883), T. II, p. 12, Hall's Mexican Laws (1885), p. 417, § 1406, "Margo & Balena, Elucidationes ad quantor libros Institutionum Im. Justiniane * * * novissimaque Resolutiones non dium compilatas Collectionibus legum Castellae nec Indianum," T. 2, p. 13. A marked distinction is noted between perennial streams, which never or very rarely completely dry up in summer, and torrents, which run only during periods of heavy rainfall.

265 S.W.2d at 271.

Appellees suggested that because the Pollan grant was made in accordance with the empresario agreement with Power and Hewitson, Decree No. 16 of the Congress of Coahuila and Texas, dated March 24, 1825, was controlling rather than decrees of 1832 and 1834. Parenthetically, the grant to Ricardo Hernandez was under Decree No. 16 of March 24, 1825, as specifically referred to in the instrument in which Governor Viesca ordered the Commissioner General to put Ricardo Hernandez in possession of the league and conceding him to terms of purchase designated by article 22. That same decree is also specifically referred to in the later instrument dated December 3, 1833, in which Manuel Imenez gave title to Francisco Ricardo and put him in possession of the land. In *McCurdy,* Justice Norvell commented that under the court's construction of the later decrees it was immaterial which legislative enactments were deemed applicable. None of them, he said, provided for sovereign retention of title to the beds of non-perennial streams.

The Chiltipin Creek was a non-perennial stream, referred to as a dry creek which never contained water save for a few holes shaded by trees, except during periods of heavy rain. It was noted that the creek had much the same characteristics in 1834 that it had at the time of the action. In this cause, the court below found that at the time of the 1833 grant to Ricardo Hernandez and at the time of the construction of the dam in 1945, Medio Creek was a non-perennial creek and only flowed when it rained in the southwest Bexar County vicinity and in the watershed of Medio Creek. The trial court further found that if sewage effluent were not introduced into the stream bed north of the Mitchell Ranch, the stream bed would remain a non-perennial stream.

Justice Norvell continued in his description of the John Pollan Grant as follows:

... The lands in the John Pollan Grant were classified in accordance with Decree 16, dated March 24, 1825. (There can be little doubt that the land classification provisions of Decree No. 16 were applicable. Art. 30 of Decree No. 272, dated March 26, 1834, provided that, hereafter no colonization contract shall be strictly fulfilled, and in entire accordance with the law of the 24th of March, 1925.) Art. 12 of Decree No. 16 refers to "grazing lands or those suitable for stock raising (de agostadero); Irrigable tillage land (de regadio) and that which is not irrigable (de temporal). The Pollan grant called for un sitio de agostadero qe ha he pedio inclusa una labor de temporal * * *, that is, one league of pasture land, including a labor of land which was subject to cultivation but dependent solely on ordinary or natural rainfall for its water supply.

This statement in the grant is of importance. It constitutes or reflects an official classification of the land made in pursuance of governmental authority and demonstrates that Chiltipin Creek was not regarded as a reliable source of irrigation. It was considered in 1834, as it is today, a dry creek or torrent to which the doctrine of sovereign ownership of stream beds had no application.

We hold that the trial court was correct in holding that the bed of Chiltipin Creek passed to John Pollan, under and by virtue of his grant of October 30, 1834.

265 S.W.2d at 271-72.

The land granted to Ricardo Hernandez was described in the document granting title and possession as 22 labors of pasture land (veinte y dos labores de agostadero) and three more of arable land (y tres mas de temporal). Further, Ricardo was

charged at the rate of 30 pesos for the league of pasture land and 20 reales per labor for the arable land, as prescribed by the Colonization Law of Coahuila and Texas, Decree No. 16 of March 24, 1825, art. 22. As was the case with Chiltipin Creek, the official classification of the land pursuant to governmental authority demonstrates that Medio Creek, which traverses the Mitchell Ranch, was not regarded as a reliable source of irrigation. Applying the pro-

vision of the Colonization Law of Coahuila and Texas of 1825[3] and the decision in *McCurdy,* it is evident that the bed of Medio Creek, to the extent that it traversed the land granted to Francisco Ricardo Hernandez, belonged to Ricardo, and through mesne conveyances, to Mitchell.

The Court in *McGee Irrigating Ditch Co. v. Hudson,* 85 Tex. 587, 22 S.W. 967 (1893), in construing General Laws 1889, p. 100, which in part provided that unappropriated

**3.** The following articles of the Ley de Colonizacion, Colonization Law, Decree No. 16, dated March 24, 1925, *of the Laws and Decrees of the State of Coahuila and Texas,* as translated by J.P. Kimball, M.D., Houston, Telegraph Power Press, 1939, are pertinent:

ART. 4. Desde el dia en que qualquier estrangero quede avecindado conforme al articulo anterior, es libre para denunciar qualquier terreno valdio, y la autoridad politica respectiva con la obligacion de pasar al gobierno el expediente que se formare para su aprobacion, si lo considerare como a todo natural del pais, areglandose a las leyes vigentes de la materia.

ART. 4. Any foreigner, from the time he is domiciliated agreeably to the foregoing article, shall be permitted to specify any vacant land, and it shall be the duty of the respective political authority to forward the instrument that shall be drawn to the executive for his approval, should he consider the applicant the same as the natives of the country, conforming to the existing laws on the subject.

ART. 12. Supuesta aquella unidad y la distincion de terrenos que a su repartimiento se hara entre los de agostaderos, o propios para cria de ganados, y los de labor de regadio, y de temporal, esta ley concede al capitulante o capitulantes de nueva poblacion por cada cien familias que introduscan y establescan en el Estado *cinco sitios de agostadero y cinco labores,* que en lo menos en su mitad habra de ser de temporal, pero solo podran cobrar en razon de ochocientas familias aunque introduxeren mas, y ninguna fraccion que no complete centenar, qualquiera que sea les dara derecho a premio ni proporcionalmente.

ART. 12. Adopting the aforesaid unit as a standard, and observing the distinction to be made on distributing lands, between grazing lands or those suitable for raising stock, and irrigable tillage land, and contractors for forming new settlements, five sitios of grazing land, and five labores, of which at least one half shall be land not irrigable, for every hundred families they shall introduce and establish in the State; but they shall receive this premium only for eight hundred families, although they should introduce more; and no fraction whatever, not completing one hundred, shall entitle them to a premium, not even proportionally.

ART. 14. A cada familia de las comprendidas en capitulacion cuyo unico exercicio sea el de labrar la tierra se dara una labor; si tuviere cria de ganados se le completara sobre aquella con tierras de agostadero un sitio; y si solo fuere ganadera o criadora tendra unicamente de estas mismas tierras de agostadero una superficie de veinte y quatro millones de varas.

ART. 14. One labor shall be granted to each family included in the contract, whose only occupation is the cultivation of the soil; and should the same also raise stock, grazing land shall be added to complete a sitio; and should the raising of stock be the exclusive occupation, the family shall receive a superficies of twenty-four million square varas, (being a sitio lacking one labor.)

ART. 22. Los nuevas pobladores en clase de reconocimiento pagaran al estado por cada sitio de agostadero treinta *pesos; veinte reales* por labor de temporal; tres pesos quatro reales por de riego y asi proporcionalmente segun la clase y parte del terreno que se les halla repartido, pero la satsfaccion de aquellas cantidades no lo verificaran sino dentro de seis anos de establecidos, y por tercios; el primero a los quatro anos; el segundo a los cinco y el tercero a los seis anos; pena de perder su terreno el que faltare a algunos de los plazos: se exceptuan de este pago los capitulantes y los militares, de que habla el articulo 10, aquellos por lo respectivo a las tierras que en clase de premio hallan merecido, y estos por lo que hallan obtenido con arreglo a sus diplomas.

ART. 22. The new settlers shall pay to the State, as an acknowledgement for each sitio of grazing land, thirty dollars; for each labor, not irrigable, two and a half; and for each that is irrigable, three and a half; and so on, proportionally, according to the class and quantity of land distributed to them; but the payment thereof need not be completed under six years from settlement, and in three instalments: the first in four, the second in five, and the third in six years, under a penalty of forfeiting the land for a failure in any of the said payments; the contractors and the military mentioned in article 10, shall be exempt from this payment; the former, as regards the lands granted them as a premium, and the latter, for that which they obtain agreeably to their patents.

waters of every river or natural stream within the arid portions of the state were declared to be property of the public and might be acquired by appropriation for irrigation, had the following to say:

> ... The word 'land' includes, not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by the hand of man, as buildings and fences. 1 Washb.Real Prop. 4; 2 Washb.Real Prop. 367; 2 Bl.Comm. 18; *Cary v. Daniels*, 8 Metc. (Mass.) [466] 480; *Lux v. Haggin*, 69 Cal. 255, 10 Pac.Rep. 674; *Scriver v. Smith*, 100 N.Y. [471] 480, 3 N.E.Rep. 675.

22 S.W. at 968.

■ This reinforces our conclusion. When the State of Coahuila and Texas granted land to Ricardo Hernandez, a small portion of which was described as arable but not irrigable, and thus dependent upon rainfall and consisting largely of pasture land fit only for grazing purposes, the State thus granted to him not only the land, but also all rainwater which might fall upon the land or which might course its way through the grant, having drained into the bed of Medio Creek. Further reinforcement is gained from the research and resultant legal memoranda and testimony of expert witnesses.

Justice Pope in the *Valmont Plantations* decision approved the consideration by a trial court of expert testimony on Mexican law and noted that that was an accepted method of proving Spanish and Mexican law. The Commission utilized the services of Professor Hans W. Baade, a professor at the University of Texas School of Law, as its expert on Spanish and Mexican law. Professor Baade wrote a 68-page memorandum entitled "Irrigation Rights of the Francisco Ricardo (Hernandez) Land Grant in and to the Medio Creek under Spanish and Mexican Law," and the memorandum was introduced at trial as an exhibit. In addition, Professor Baade testified at trial. Professor Baade agreed that the law of Coahuila and Texas as it existed at the time of concession of the land on March 8, 1830, and at the time the instrument of title and possession was executed on December 3, 1833, was determinative of this cause. Specifically, the grant having been conceded pursuant to the State Colonization Law of 1825, that law governed the grant itself. He argued, however, from the State Colonization Law of April 28, 1832, particularly with regard to article 5 thereof, which called for "exact distribution of land, lots, and water" in new settlements to be established, that this indicated land and water would be granted separately. The Ricardo Hernandez grant, however, was not made pursuant to that law.

Professor Baade was of the opinion that the water, and any rights to use it, on the Francisco Ricardo Hernandez grant was not covered by any pertinent legislation of the State of Coahuila and Texas nor of the Mexican Republic. Professor Baade proceeded then to review the Roman law, commencing with Book II of the Institutes as enacted by Justinian in 533 A.D. A brief distillation of his discussion of the Justinian Code was that certain things were common to all: air, *running water,* the sea, and therefore, the sea shores. In addition, rivers and ports were public, as was the right to fish. It was also pointed out, however, that rivers could be perennial or torrential; and a perennial river was one which always flowed. Dig. 43, 12, 1, § 2. Mr. Baade admitted that the bed of a private river belonged to the owner, as was held in *McCurdy,* but stated that ownership of the waters of such "rivers" was not settled with equal clarity in the Roman law. Mr. Baade made what he described as a logical assumption that all running water, even the waters of a private "river," were in the public domain. He agreed that the contrary argument was made by Vinnius.

Professor Baade reviewed the law of Castile and of the Indies. His investigation closely paralleled Justice Pope's historical investigation in *Valmont Plantations,* and no useful purpose would be served by detailing the opinion of Professor Baade, which in general was that in the Indies, or New Spain, the King held title to all land and water and retained title to such unless

specifically granted, and that there was no grant of title or right by implication. We do not argue with that rule of law, as that is precisely what Justice Pope held in *Valmont Plantations* with regard to irrigation rights claimed by riparian owners whose land abutted upon a perennial navigable river, the bed and water of which were in the public domain.

Mitchell presented as expert witnesses, Lic. Rodolfo Cruz Miramontes and Lic. Gustavo J. Perez G., practicing attorneys in Mexico City, and Lic. Santiago Onate, an attorney and professor of law at the Universidad Autonoma Metropolitana and at the Universidad Nacional Autonoma de Mexico. Sr. Onate was the son of Lic. Onate, who testified as an expert for the successful appropriators in *Valmont Plantations* and to whom Justice Pope refers in that opinion. Lic. Miramontes and Lic. Perez collaborated in writing a single memorandum, the English version of which was more than 100 pages in length, and Lic. Onate prepared a document entitled "Memorandum on the Rights in Waters of the Medio Creek in Accordance With the Mexican Law in Force in 1833. Each of these two instruments was received into the evidence as an exhibit, and each of the three Mexican attorneys testified in person.

Lic. Onate's is the most concise of the legal memoranda accepted into evidence. He pointed out that the Mexican legal system that emerged from the War of Independence (in 1821) was a mixture of old and new laws, a combination regulated by the principle of political necessity and not by that of systematic coherence. Noting that the Ricardo Hernandez grant was made under the Colonization Law of the State of Coahuila and Texas of March 24, 1825, he commented that grants of land were given at that time in order to help the settlement of new inhabitants and to develop agriculture. Having studied the primary sources of law, Sr. Onate said:

> From the primary sources, that is to say the laws enacted by the independent authorities, we can gather the following asserts:

> a) In Independent Mexico coexisted at least two different types of property: public property and private property.

> b) Public property was administered by the State and was integrated by ports, navigable rivers, harbours, public highways and all portion of land that was not in the domain of private hands.

> c) Public authorities of each State had the prerrogative of confering grants of land and water to particulars.

> d) The different rules related to "colonizacion" and grants did not regulate specifically the legal nature of the grant, they only settled the procedure that had to be followed in order to obtain a grant from the public authorities.

> e) Grants constituted a regular form of constitution of private property.

> f) The colonization laws of Independent Mexico draw a clear distinction among the types of land wich [sic] could be granted as follows: irrigable *(de regadio)*, not irrigable (de temporal) and grazing lands (de agostadero) in accordance with the possibilities of irrigation.

Sr. Onate acknowledged that the Spanish crown became the legal owner of all "the lands, fields, mountains, pastures, rivers, and waters" of the Indies as established by the Recopilacion de las Leyes de Indias (Law XIV, Title XII, Book IV, and Law I, Title I, Book III). Thus when Mexico became an independent state it inherited such right of ownership upon all vacant lands, and upon all those lands and waters that had been public property during the colonial period. All grants, in accordance with the colonization laws, should contain the description of the types of land that it encompassed. These types were irrigable (de regadio), non-irrigable or arable (de temporal) and grazing lands (de agostadero). Both irrigable and non-irrigable or arable lands were to be used for agriculture and therefore each had to have water facilities. The difference, according to Lic. Onate, rested in the fact that while irrigable land is irrigated all year round due to the hydrological nature of the subsoil, the special water facilities derived from the existence of a

grant upon the use of waters of a public river or lagoon, or the existence of aqueducts, etc., non-irrigable land was irrigated by water that came from pluvial precipitation and was therefore available only during certain periods. The pluvial water became the property of the owner of the land who was entitled to use it. There was never a prohibition against building a cistern or water deposit in order to use the rainfall in a more profitable way. Lic. Onate also pointed out that under *Las Siete Partidas* all inhabitants had the duty to make land profitable (Law IV, Title XX, Part .2) and that everyone was entitled to the use of rainfall in accordance to his needs. (Law III, Title XXVIII of the Third). The *Partidas* also determined that running waters originating on land were available for private appropriation and use.

Professor Onate also cited the Spanish Ley de Aguas (June 13, 1879), which stated in its first article that all "waters that come from pluvial precipitation on the property of the owner of the land where the waters fell and flowed. Therefore, he can build within the boundaries of its land any reservoirs, dams, cisterns, and any other devise in order to entrap such water as long as, in doing so, he does not damage a third party or the public." In article 4 it was said that pluvial waters followed the character of the land where they flow; if it were private they were private, and if it were public they were public. Sr. Onate said that a clear distinction was thus made between rivers and waters, which were always public, and creeks, which could be public or private depending on the nature of the land on which they flow. He cited Professor Teodosio Lares, thought to be the most reputed author on 19th century Mexican

administrative law, to the effect that a grant or authorization to use waters was necessary only when the water was that of a river of the public domain, and that use of water from private sources—creeks, pools, springs was not subject to administrative rules. In addition, Lic. Onate cited Professor Jacinto Pallares, professor of civil law, to the effect that creeks, their beds and waters, are private domain while rivers are public, explaining that for Pallares, the difference between a river and a creek was the size and the opinions of those who lived along its course. He also noted that in Prontuario de Leyes Decretos del Estado de Coahuila, Cosme Garza Garcia reported that he had inspected more than 80 different grants or authorizations given by the State for the private use of waters, and that all such decrees were related to river waters, there being no mention of any grant for the use of waters that flowed in creeks.[4] Sr. Onate concluded that grants which included use of private waters did not expressly speak of such water. The Ricardo Hernandez grant entitled the grantee to private property of 22 labors of pasture land and three of arable land, and there was no mention of a grant of water in the Medio Creek, since the creek was, and still is, of a private nature; and therefore no authorization was needed in conformity with the then applicable law to entrap and use pluvial waters that intermittently flowed and flow in such non-perennial stream.

Srs. Miramontes and Perez, in their longer memorandum, reached substantially the same conclusions. More than half of their discussion revolves about the federal laws and decrees of Mexico and the laws and decrees of the State of Coahuila and Texas from 1821 through the time that Ricardo

4. In his memorandum prepared for trial and which was in possession of the Commission prior to trial and which was admitted into evidence at trial, Lic. Onate described the inspection of 80 grants of water rights in which no grant of water from a non-perennial stream was found. The Commission presented no evidence to the contrary. When Mitchell in appellee's brief, argued the fact that the Commission failed to demonstrate that water from non-perennial streams was the subject of specific

grants, the Commission responded with a reply brief containing photocopies of instruments in which certain grants of water from non-perennial streams may have been made; and in a reply brief, Mitchell undertook to explain why those examples were not applicable. We have determined, however, that such documents are evidentiary in nature, and since they were not introduced at trial, they are not properly before us and may not be considered.

Hernandez received title of possession in December of 1833. They pointed out that under the law pursuant to which the property title was issued, there were several stipulations, among them that the holder of the property was obliged to work and cultivate the land, and that failure to comply was sufficient cause for him to lose his property. The State was concerned about the settlement of the land to the extent that transfer of land was possible only with the understanding that the one who acquired the land would be obligated to cultivate it under the same terms and conditions as the initial possessor. As a corollary, the document which granted possession to Ricardo Hernandez also ordained that he might possess and freely enjoy the benefits of the land, with all uses, customs and appurtenances.

Srs. Miramontes and Perez also devoted attention to the law of New Spain, the law of Peninsular Spain, and the Roman law. They quoted Professor Pallares in his book *General Complementary Legislation of Mexican Civil Law,* at page LX, as follows:

> National jurists teach that in Mexico Spanish laws were not entirely applicable on the subject of waters (Sala Mexicano, Tomo I. Lib. 2o Tit. 1o Num. 9); that in accordance with the laws of the Indies water has been considered a part of the royal patrimony which could be acquired by grant, in the same terms as land, as ordained by law 7, title 12, book 4, of the Recopilacion de Indias; that waters that had not been conceded to the ownership of private individuals through a Royal grant could be dealt with in the terms of the Spanish laws; that Spanish laws, following the Roman tradition (L. la. par. 2 dererum divisione D), classify rivers or currents of waters in two categories, one class which is not in commerce and appertains to public use, and others which belong to private owners; that the first class are those that have a perennial or an almost perennial flow. The difference between a river and an arroyo is the size and also the opinion of those who live along its course. L. 1a. Tit. 13, Lib. 43 D. y Glosa al parrafo 2o, Tit. 1o, Lib. 2 de la Instituta.

Srs. Miramontes and Perez referred extensively to the work of Dr. Ramon Martinez Lopez, prepared in connection with the trial of *McCurdy v. Morgan, supra,* which expounded the principle of private ownership of waters, while recognizing the non-private nature of navigable and permanent rivers. The same commentator cites *Tractatus de Fructibus* by Lagunez for the proposition that water courses always acquire the legal status of the land through which they flow. And for a classification of public and private waters, Lagunez followed strictly the Justinian criterion of the perennial or non-perennial flow applied respectively to rivers and torrents. Finally, the authors quote from "Ordinances on Lands and Waters," Perez, 1856 Arbieu Press, 5th Edition, page 17, saying that a river might be defined as an aggregate of waters that run perpetually, or from times immemorial, confined between two banks; and it differs from a torrent in that a torrent is the result of abundant rains or extraordinary melting of snow in such a way that it runs for only a short time, and the bed of the river is dry during the major part of the year.

Srs. Miramontes and Perez refer to the Roman law as an antecedent to Spanish law for the proposition that a river is distinguished from a brook either by its size or by the opinion of those living along it; that some rivers are perennial and some are torrential, and that a perennial river is one which flows continually. They point out that under Roman law a torrential river was one which flowed intermittently (in cold weather or in the winter). Cassius defined a public river as a perennial river, and Celsus approved that definition. Many citations and quotations are given, all of which help to demonstrate that under the Roman system all perennial or continually flowing rivers were public waters, while those which were intermittent, and brooks, were not suitable for public use and were private.

Srs. Miramontes and Perez concluded that the nature of the land granted to Ricardo Hernandez indicated that the only

possibility for irrigation was water obtained from rains or melting ice. At the time of classification of the land, the existence of Medio Creek which crossed the land was taken into consideration, and it followed that the creek, a non-perennial stream, belonged to Ricardo Hernandez. As such, the waters that occasionally ran along its bed were waters considered to be subject to private ownership by the owner of that land.

The Commission also argues that public policy considerations militate in favor of its position. The result reached by the trial court, the Commission contends, threatens the orderly administration of the State's water policies by establishing that some landowners have ownership rights in the water of non-perennial streams that are beyond the State's power to regulate in the same fashion as the rights of other landowners with respect to waters of the same non-perennial streams.

We acknowledge that the recognition of such different ownership rights, falling as they do outside the statutory scheme of regulation of riparian interest, will probably give rise to administrative and regulatory problems not contemplated by the Legislature when it enacted the Texas Water Rights Adjudication Act. That fact, however, cannot serve as a justification for ignoring or refusing to recognize the rights granted under the law of the sovereign in 1833. While some of the consequences of our decision may be anomalous, they result from the unique history of Texas and Texas land titles. Accordingly, we reject the Commission's public policy argument.

We conclude that the trial court was correct in finding that claimant Mitchell owned in fee and may capture and use all storm and rain water flowing in Medio Creek, and so holding, we must and do find that under the laws of Coahuila and Texas as they pertained to the grant of this one league of land to Francisco Ricardo Hernandez in 1833, there was included in such grant title to the bed of Medio Creek as it traversed such grant and to all storm and rain water which might be collected in or might flow in Medio Creek. In so holding, we do not comment upon the trial court's disposition of sewage effluent discharged into Medio Creek. We are aware that the owners of the sewage treatment plants north of the Mitchell Ranch on Medio Creek could withhold and otherwise dispose of that water at will; and if they did so, Medio Creek would revert to being a non-perennial stream, dry most of the time. Furthermore, the State did not raise a point of error with regard to the trial court's judgment as it related to sewage effluent. The questions of ownership, of right to use, and of right to control the effluent are therefore not before us, and we refrain from comment on those matters. We overrule the second point of error.

■ In its third point of error, the Commission contends that the trial court erred in "recognizing a water right to anything beyond existing uses." The Commission argues that even if Mitchell acquired private water rights from the Mexican sovereign, those rights are properly limited by Tex. Water Code Ann. § 11.303(b) to uses existing between 1963 and 1967.

■ The Commission concedes that the Act is "intended primarily as a means of limiting *riparian* rights to existing uses," (emphasis added), but insists that it is "fully applicable to appellees' claimed right." That argument ignores the fact that riparian rights are of a significantly different character from the property interests in issue here. The riparian rights intended to be regulated by the Act are rights to "a usufructory use of what the State owns." *In re: The Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin,* 26 Tex.Sup. Ct.J. 116 (November 24, 1982). The trial court determined, on the other hand, and we have agreed, that Mitchell's right is an ownership right in the water entering the stream from natural sources. The Commission describes the statutory scheme as one involving "appropriation" of water for beneficial uses, as limited by uses existing between 1963 and 1967. If the Act were applicable to the water owned by Mitchell,

so as to entitle the state to appropriate all or part of the water entering the stream from natural sources, then Mitchell would be entitled to just compensation for the taking of their property. Tex.Const. art. I, § 17; *McGee Irrigating Ditch Co. v. Hudson, supra.* The third point of error is overruled.

The judgment is affirmed.

REEVES, Justice.

I respectfully dissent. While I concur in the majority's disposition of point of error one, concerning the jurisdiction of the trial court, I believe the majority is mistaken in their interpretation of the Mexican law applicable at the time of the Hernandez Grant.

The Water Commission, in both its final and Modified Final Determination, concluded that:

No claim [of water] was recognized for land granted by Spain or Mexico in the absence of proof showing the existence of a specific grant of water.

Appellee's title to his tract is based on a grant made to Francisco Ricardo Hernandez in 1833 by the Mexican State of Coahuila and Texas. The land grant read in part:

As legal owner he may possess and enjoy freely the tract which has been reported with all the uses, customs, and appurtenances which correspond to him now and always.

The Medio Creek, which was a non-perennial stream in 1833, crossed the boundaries of the tract. No mention of water rights appears in the conveyance and thus appellee initially failed as a claimant before the Commission. The Commission derived its requirement of an express grant of water from the holding in *State v. Valmont Plantations,* 346 S.W.2d 853 (Tex.Civ.App.—San Antonio 1961, *opinion adopted,* 163 Tex. 381, 355 S.W.2d 502 (Tex.1962)), that civilian grantees did not possess implied riparian irrigation rights. The appellees excepted to the Commission's determination.

The trial court, in turn, reversed the Commission and found that the "claimant owns in fee and may capture and use all storm and rain waters flowing in the Medio Creek." This conclusion was based apparently, at least in part, on two legal principles. The judgment recites the rule in *McCurdy v. Morgan,* 265 S.W.2d 269 (Tex. Civ.App.—San Antonio 1954, writ ref'd), that a civil law land grantee did own the streambed of a non-perennial stream within his tract. The court also made reference to the rule which has its origins in Roman civil law that a grantee owns the waters of a non-perennial stream when the stream is contained entirely within the boundaries of the grantee's tract.

The question on appeal thus turns on whether, as the State argues, the rule in *Valmont Plantations, supra,* extends to non-perennial streams and an expressed grant of water is required to have an interest in the waters of Medio Creek, or whether a conveyance under Mexican law in 1833 carried an implied grant of water rights in non-perennial streams. The question must be resolved by application of the law of the sovereign at the time of the grant. *San Antonio River Authority v. Lewis,* 363 S.W.2d 444, 447 (Tex.1963). The law of this case is the law of Mexico in 1833.

The law of Mexico in 1833 was a product of Mexican history. After obtaining independence from Spain in 1821, Mexico promulgated a constitution in 1824 creating a federal republic and guaranteeing among other rights, the right to property. Mex. Const. art. XI (1824). The Mexican National Congress subsequently enacted legislation intended to foster colonization. The various constituent states of the new republic also adopted constitutions. The State of Coahuila and Texas, moreover, enacted colonization laws in 1825 and 1832. The federal constitution left the subject of water law, by implication, to the states. Both parties agree that any acts or ordinances by the governments of the Mexican Republic or the State of Coahuila and Texas would govern. Both parties also agree, however, that there is no dispositive law on the subject of rights in non-perennial waters contained in either the Mexican national or state constitutions or in any legislation or ordinances

enacted by either level of Mexican government. The parties, as shall be noted later, make different inferences from the colonization legislation enacted by both the federal and state governments during this period.

Where the positive law of Mexico provides no definitive answer, resort must be had to pre-1821 Spanish law. More specifically, the law of New Spain (colonial law) has priority over the law of Peninsular Spain. This distinction, between the law of New Spain and Peninsular Spain, dates from the 17th Century. The Castilian kings of Spain treated their dominions in the New World as part of their royal patrimony or as personal property. But in order to facilitate effective royal government, a Council of the Indies was established to make laws for and to govern the Spanish colonies in the Americas. Under the *cedula* of December 14, 1614, Castilian law was decreed to be applicable in New Spain only to the degree it was enacted by The Council of the Indies. Indian law, therefore, developed independently of, if not in contradiction with, Castilian or Peninsular Spanish law. The primary sources of Indian law are the Recopilacion de las leyos de Indias (1680), and subsequent compilations of laws and ordinances effective in the Indies. Only when the law of the Indies is silent is the law of Peninsular Spain relied upon. The parties agree that the following hierarchy existed within Spanish Peninsular law:

1.  *Leyes de Toro* (1505).
2.  *Ordenamiento de Alcala* (1386).
3.  *Fueros Municipales y Reales.*
4.  *Siete Partidas* (1286).

The parties are in dispute, however, on the place or influence of Roman law has in Spanish Peninsular law. This dispute need only be resolved, of course, if we are compelled to rely upon Peninsular law to resolve the questions raised by this case.

I find upon examination of relevant authority, bearing in mind the hierarchy of applicable law, that appellant is correct in his assertion that the rule in *Valmont supra,* extends to non-perennial streams. Conversely, I believe that *McCurdy supra,* is

dispositive of only the ownership of streambeds and not the waters of non-perennial streams. The law of the Indies, examined thoroughly by Justice Pope in *Valmont Plantations,* is controlling. There is no definitive rule in Mexican legislation concerning waters of non-perennial streams. However, the colonization laws of the period support a requirement of explicit grants. The treatment of non-perennial stream waters under Peninsular Spanish, Roman, and other civil law systems was not adopted in New Spain.

The court in *Valmont Plantations* noted that:

> According to the laws of Spain, the king owned a monopoly over the Indies. They were his private property, his royal patrimony. Colonial administration was his exclusive prerogative and the king's will was the law.

*State v. Valmont Plantations,* 346 S.W.2d 853, 859 (Tex.Civ.App.—San Antonio 1961, opinion adopted, 163 Tex. 381, 355 S.W.2d 502 (Tex.1962). The *Recopilacion* recites from the year 1519 the following:

> By grant of the holy Apostolic See and other just and legitimate titles, we are lords of the West Indies, the islands and continents of their oceans, discovered and to be discovered, and they are incorporated in our royal crown of Castile.

Recopilacion de las leyes de las Indias, Book III, Title 1, Law 1 (1519).

The care and management of the king's property, of the New World, was delegated to The Council of the Indies in the year 1520. *See Valmont Plantations,* 346 S.W.2d 853, 859 (Tex.Civ.App.—San Antonio 1961, opinion adopted, 163 Tex. 381, 355 S.W.2d 502 (Tex.1962). Among the duties of the royal officials of New Spain was the conveyance of land and water rights:

> The viceroys and audencias shall see to what shall be of good government in regard to the pastures, waters, and public buildings.

Recopilacion de las leyes de las Indias, Book IV, Title 17, Law 9 (1532).

The court in *Valmont* found that in guarding the king's interests the governors of New Spain would not part with rights by implication. Appellees argue strenuously that the rule in *Valmont* is not applicable to non-perennial stream waters. The heart of appellees' argument is that the rule governing ownership of non-perennial stream waters is to be found in Peninsular Spanish law, heavily influenced by Roman law. Appellee contends the law of Castile made a distinction between public waters, rivers and perennial streams, and private waters, creeks and non-perennial streams. The former were held in common, while the latter were the property of the landowners who could use them as they saw fit so long as the use was not to the detriment of third parties. Further, the distinction held true under ancient Roman law. Doctor Hans Baade, the State's expert witness, quarreled with the appellees' interpretation of Peninsular and Roman law. Doctor Baade is of the opinion that Peninsular Spanish and Roman law permitted ownership of non-perennial stream waters only where the stream was wholly contained within the land owner's tract. The Medio Creek, crosses several tracts of land above and below the Hernandez grant.

The actual law of the Indies codified in the *Recopilacion,* certain key events in Spanish colonial history, and commentaries on Indian law, support appellants' position. Initially, the inclusion of the New World as part of the King's personal domain, his *realengo* is not consistent with a private-public distinction for property. As Doctor Baade stated in his memorandum on the Hernandez grant:

> The chief consequence of the direct proprietary title of the kings of Castile to the territories of the Spanish Indies was quite simply that there was no immediate need for distinguishing public and private water courses.

Memorandum: Irrigation Rights of the Francisco Ricardo (Hernandez) Land Grant, 41.

Provisions within the *Recopilacion,* itself, are also instructive. The viceroys and au-

dencias were, for administrative convenience, granted the authority to act for the king in disposing of his land and waters in New Spain. On the subject of water rights, these officials were instructed that:

> The woods, pastures, and waters of the settlement and the woods contained in grants which have been made or which we shall make . . . in the Indies, must be common to Spaniards and Indians.

Recopilacion de las leyes de las Indias, Book IV, Title 17, Law 7 (1533).

> We have ordered that the pasture, woods and water be common in the Indies. . . .

*Id.,* Book IV, Title 17, Law 5 (1541, 1550).

The term water or "agua" used in the *Recopilacion,* does not, however, according to appellee, encompass non-perennial streams. Yet the language of the *cedula* dates from a decision of the *audencias* of the Indies in the matter of the land grant to Hernan Cortez in 1529. Cortez received a substantial grant of territory in Mexico with the provision that the grant included "woods, pastures, and running, stagnant, and percolating waters." Protests arose against the magnitude and unfettered nature of the grant to a private individual. The *audencias* of the Indies resolved the conflict by declaring in a *cedula* in 1533 that woods, pastures, and waters of places and forests conveyed to private individuals would be held in common. Baade, Memorandum: Irrigation Rights of the Francisco Ricardo (Hernandez) Grant, 45–46. This classification of waters, was made in response to the Cortez Grant, enumerating the various kinds of waters and was later codified in the *Recopilacion.* Recopilacion de las leyes de Indias, Book IV, Title 17, Laws 5, 7 (1533, 1541, 1550).

The court in *Valmont* cited Lic. Enriquez, a civil law commentator, for the proposition that:

> \* \* \* \* \* \*
>
> (3) That the primary title was always the grant to such an extent that when a title of land did not mention waters, a right of water was never considered to exist, solely by reason of proximity or accession. . . .
>
> \* \* \* \* \* \*

(5) Waters that were not granted remained in the Royal Patrimony;

(6) In New Spain the distinction of Spanish Peninsular law between public and private rivers was never in force, nor did colonial law contemplate rivers as things distinct from the waters, because it was the property of the crown. . . .

*State v. Valmont Plantations,* 346 S.W.2d 853, 862 (Tex.Civ.App.—San Antonio 1961), *opinion adopted,* 163 Tex. 381, 355 S.W.2d 502 (Tex.1962).

Waters that were not granted remained in the royal patrimony. The court also noted the opinion of Lasso de Vega, who stated that:

It is necessary that the private possessor allege and prove that these things [waters] have been conceded to them by a special grant from the same king and Catholic masters, or in their name; because the law says: only the prince and no one else has the right to grant waters.

*Valmont* at 861.

The authorities relied upon in *Valmont,* therefore, emphasize the supremacy of the crown over waters in New Spain and the strong prejudice against implied grants operating against the Crown. As noted, one authority, Enriquez, explicitly found that the private public distinction was not applied in New Spain. Similarly, Molina Enriques wrote concerning Mexican water law that:

When rain waters enter a visible and fixed channel in which they run periodically, they then cease to be definitely communal, because the bed is already part of their condition, and they are transformed into creeks, whose total and definite appropriation is now possible. Nevertheless, there still is no accession between the waters and the source: first, because no statute and no principal of our national law has established such accession. Secondly, because the constant movement of the waters and the immobility of the channel combined to repudiate any idea of permanent union between the former and the latter. Thus, only when

dealing with the creek that rises and terminates within the same estate can the land owner consider the creek to be his. Beyond that case, the accession of waters of the creek to the land in which it rises to the lands through which it passes, is an absurdity rejected by common sense.

Baade, Memorandum: Irrigation Rights of the Francisco Ricardo (Hernandez) Land Grant, 56–57. The Medio Creek is not, of course, wholly contained within the Hernandez tract and in fact crosses several adjacent tracts.

The statutory framework for colonization established by the State of Coahuila and Texas in this period is also of assistance in resolving our question. Under the state Colonization law of 1825, which codified much of the law of the Indies, the system of land price classification provided:

The new colonist shall as a species of acknowledgment pay to the state for each lot of pasture land, $30.00, $2.50 each subdivision of arable land not irrigated, and $3.50 for each one of irrigated land.

1 H. Gammels, Law of Texas 102, art. 22 (1898).

In article 12 of the act, the following was provided for:

Supposing the quantity of land above stated to be the unity, and a division of the land being made, when distributed into grazing land and those adopted for tillage by means of irrigation, or not required or not requiring irrigation. . . .

1 H. Gammels, Laws of Texas 101, art. 12 (1898).

The Hernandez grant included both pasture land and arable land, but no provision was made for irrigated land. Arable land was that land which was capable of cultivation from rainwater alone. The subsequent Colonization Act of 1832 uses the generic term "waters" on several occasions, see 1 H. Gammels 298, arts. 5, 7, 21 (1898), as well as the mandate:

The survey of vacant lands that shall be made upon the borders of any river, running rivulet or creek, or lake, shall not exceed one-fourth of the depth of the land granted, should the land permit.

1 H. Gammels, Laws of Texas 302, art. 29 (1898).

The State colonization program, therefore, envisioned a detailed system of grants based in part on differences in water rights. The laws of 1825 and 1832 made no express distinction for treating rivers and creeks differently and in fact used the general term waters. Creeks, rivulets, and lakes were to be surveyed for purposes of land conveyances as were rivers. The Hernandez grant contains a reference to the Medio Creek for purposes of the land survey, but contains no specific grant of rights in the waters of the Medio Creek.

The appellees point to the public policy of the various successive governments from Spain to Independent Mexico, to colonize the sparcely populated lands of Texas. This policy, so the argument goes, would have been frustrated if the settlers could not have enjoyed the ownership of the non-perennial stream waters contained on the land. A similar policy argument was advanced in *Valmont Plantations* on behalf of ownership of riparian rights and rivers, which in the context of available technologies would have been much more valuable to the land owners, and was rejected in the face of conflicting law. *State v. Valmont Plantations,* 346 S.W.2d 853, 869, 878 (Tex.Civ. App.—San Antonio 1961), *opinion adopted,* 163 Tex. 381, 355 S.W.2d 502 (Tex.1962). Perhaps wise policy should have dictated implied ownership of waters by settlers. But an equally convincing public policy argument, reflected in authorities since the dispute over the Cortez grant in the sixteenth century, Recopilacion de las leyes de Indias, Book IV, Title 17, Laws 5, 7 (1533, 1541, 1550), is that water was a critically important resource held for the common good by the Spanish crown and the successor sovereigns of Texas. Similarly, minerals, also highly prized, were owned by the

crown in common. Baade, Memorandum: Irrigation Rights of the Francisco Ricardo (Hernandez) Land Grant, 24–25.

Additionally, appellees advanced the contention that no practical reason existed to require explicit grants of non-perennial streams in that the tract owners' use of such waters was the equivalent of exploiting the rainwaters he owned as a matter of right. This argument blurs the distinction between the collection of diffuse surface waters and the use of water contained in streams.[1] The Medio Creek in 1833 may have been exclusively fed by rainwater, but it was nonetheless a creek, and part of the general watershed of the Medina River. Moreover, a non-perennial stream need not be an insubstantial body of water and the term includes streams which flow nine months of the year and are only dry during the summer months.

Appellees also state that their research of grants during this period reveal no grants which includes rights and non-perennial streams. There are, however, examples of grants presented by the State:

> I grant to Paro Lopez Pinta, presbyter, the water of three creeks, a very small one called Anamasquistle. . . . (1615).

> That said second lieutenant owns a hacienda in the jurisdiction of that congregation through which flows a river which comes down from the mountain range and mines . . . and which is not perrenial and does not have any streams because it runs only in the rainy season and when the creeks are running. . . .

Reply Brief for Appellant, Appendix VI at 8–10, 18–20.

The appellees attempt to distinguish these grants as actions by overly cautious land owners who desire to avoid potential disputes with neighbors by obtaining administrative resolutions by the authorities concerning water rights. Nonetheless,

---

1. R.E. Clark, Water and Water Rights, § 52.1 (Allen Smith Co. 1967). One authority on water law stated that "surface watercourse and diffused surface waters are mutually exclusive." W. Hutchins, The Texas Law of Water Rights 36 (1961). In referring to civil grants, Hutchins also stated

> The rights of grantees of lands granted by Spain or Mexico extended, under the civil law, to the *use of diffused surface waters* collecting on their lands, such vested rights could not be divested by the State. . . .
> *Id.* at 36. (Emphasis added).

these grants stand as evidence that non-perennial streams were subject to explicit references and grants. The limited number of such grants is probably attributable to the limited utility of non-perennial streams for irrigation purposes under the then existing technologies for irrigation. Moreover, the fact that ownership of non-perennial streams could not be held by private individuals unless an explicit grant was made, did not deny the right to individuals to make use of these waters.[2] The purpose of classifying streams as part of the royal or public domain was to protect access to these waters by the public manner and to prevent exclusive use by individual private landowners. I would, therefore, sustain the appellant's second point of error.

2. Professor Santiago Onate testified before the trial court that:

Well, in accordance with the law of the time other people could have traversed or crossed the grant in order to water his cattle, for example, their cattle, or to use the water for his private purposes if they did have a title to do that and the title to do that is called in our tradition a sevitude. . . .

Statement of Facts at 166.